STATE of Tennessee, Appellee,

v.

**Danny Ray LACY, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Nov. 24, 1997.

Application for Permission to Appeal Denied by Supreme Court Sept. 21, 1998.

 

Clifford K. McGown, Jr., Waverly, (On Appeal), George Morton Googe, District Public Defender, Jackson, (At Trial and of Counsel on Appeal), for the Appellant.

John Knox Walkup, Attorney General & Reporter, Kenneth W. Rucker, Asst. Attorney General, Nashville, Jerry Woodall, District Attorney General, Al Earls, Asst. District Attorney General, Jackson, for the Appellee.

*OPINION*

PEAY, J.

The defendant was indicted on April 3, 1995, for the first-degree murder by aggravated child abuse[1] of five-year-old David Hammond, Jr. A jury convicted him of the charged offense and sentenced him to life imprisonment without the possibility of parole. In this appeal as of right, the defendant raises the following issues:

I.   The trial court erred by allowing testimony regarding injuries suffered by David Hammond, Jr., [hereinafter referred to as "D.J."] two years prior to his death when the defendant had not been convicted of inflicting those injuries.

II.   The trial court erred by admitting five photographs taken of D.J. in 1992 while he was a patient in a Salt Lake City, Utah, hospital.

III.   The trial court erred by permitting Dr. Karen Hansen to testify as a child abuse expert.

IV.   The trial court erred by instructing the jury to consider the age of the victim as an aggravating factor because the age of the victim was an essential element of the charged offense.

V.   The defendant's sentence of life without parole is excessive.

VI.   The evidence is insufficient to sustain the defendant's conviction given the trial court's erroneous rulings with regard to the above issues.

After a review of the record and applicable law, we find no errors and affirm both the defendant's conviction and sentence.

## BACKGROUND FACTS

Evangeline Anderson, D.J.'s mother, began dating the defendant in April of 1991 while living in Jackson, Tennessee. A short time later, she visited her brother in Salt Lake City, Utah, and decided to move there. The defendant joined Anderson and D.J. in Salt Lake City about a month later. At the defendant's trial, Anderson testified that the defendant and D.J. had laughed and talked and that they had played together. The defendant was not D.J.'s natural father.

On March 22, 1992, while the trio was living in Salt Lake City, the defendant became angry at D.J. for wetting his pants. Anderson testified that even though D.J. had not been quite two years old, the defendant had become angry at D.J., pulled down his pants, and whipped him with a switch. Anderson testified that she had told the defendant to stop but that he had refused. She further testified that she had attempted to call the police but that the defendant had thrown the telephone at her. Anderson tes-

---

1.   T.C.A. § 39–13–202(a)(4) (1994 Supp.)

tified that the defendant had then hit D.J. in the head with the television remote control. Anderson then grabbed her son and fled the residence. She testified that D.J. had had marks on his body from being hit by the switch and had a little blood by his nose. She and D.J. returned to Jackson the next day.

However, the following month, Anderson and D.J. returned to Salt Lake City and began living with the defendant once again. Anderson testified that the defendant had said he was sorry for the way he had treated D.J. and that there were no further problems until August 1992.

One afternoon in August of 1992, Anderson left D.J. in the defendant's care while she went to her job at a convenience store. She testified that when she arrived at home after work, she noticed bruises on D.J.'s face and arms. Anderson testified that she had questioned the defendant about the bruises and that he had said he had to whip D.J. because he was being bad. She testified that the next day she had noticed some "fine little bumps" on D.J. She also noticed some red marks on his back. She purchased some cream and applied it to the bumps. On the third day, as she was giving D.J. a bath, Anderson noticed blisters on D.J.'s legs and buttocks. D.J. was then taken to the hospital where he remained until the end of September. Anderson testified that she had asked the defendant about the origin of the blisters but he had no explanation. However, Anderson testified that the defendant had later told her that the marks on D.J.'s body were made when the defendant hit D.J. with a brush.

Because of the unexplained injuries to D.J., Anderson lost custody of her son. Her mother, Virginia Anderson, later gained custody of D.J. and cared for him in her home in Jackson. Evangeline Anderson then left Utah in October of 1992 and moved in with Virginia Anderson and D.J. in their home in Jackson. The defendant also returned to Jackson at this time and lived with his mother. He and Evangeline Anderson continued to date each other and in March 1993, they began to live together. D.J. joined them shortly thereafter. While living together,

Anderson and the defendant devised a form of discipline for D.J. called "bouncing." Anderson demonstrated this technique for the jury. The punishment apparently amounted to squatting to the knees and bouncing up and down. She testified that she and the defendant would make D.J. "bounce" for ten to fifteen minutes rather than whipping him. However, she admitted that she did still whip him from time to time.

On November 17, 1994, Anderson received a note from D.J.'s kindergarten teacher saying that D.J. had been disrupting class by talking too much. Anderson testified that because of the note, the defendant whipped D.J. with a belt leaving marks on D.J.'s legs, neck, and back. She testified that she had told him to stop, but the defendant refused. The next day, Anderson picked D.J. up at school and spoke to his teacher, Stephanie Lynn Stephens Beasley, about the earlier note. Ms. Beasley testified that during the conversation, she had asked Anderson about the marks on D.J. and that Anderson had admitted to whipping the child. Ms. Beasley further testified that Anderson had said she whipped D.J. good and that she had raised her arm above her head and had said she had it up to here with him. At trial, Anderson said she did not remember making such remarks.

On Sunday, November 20, 1994, Anderson began getting ready for church. She testified that D.J. had been eating his breakfast slowly and that this had angered the defendant. As a result, the defendant made D.J. start "bouncing." Anderson testified that while D.J. had been bouncing, the defendant had hit D.J. with his hand, causing him to fall over. Despite already being dressed in his church clothes, a black turtleneck and black pants with white specks, Anderson decided to leave D.J. at home. She testified that the defendant and D.J. had talked and that everything seemed all right. She then left the house around 11:00 a.m. and went to church.

Anderson testified that she did not return home from church until about ten after six o'clock that evening. She testified that she entered the house through the back door and then went into the bedroom she shared with the defendant. She testified that the defen-

dant had been lying on the bed watching television. She showed the defendant a suit that someone had given her at church for D.J. and then called D.J.'s name in order to show him the suit too. When D.J. did not answer, Anderson went into D.J.'s bedroom and turned on the light. When she could not get a response from D.J. she yelled to the defendant that D.J. was not breathing. Anderson testified that she had then called 911. She further testified that the defendant had taken the phone from her and had begun to talk to the operator. The operator instructed the defendant to perform CPR which the defendant attempted to do. Shortly thereafter, emergency personnel arrived and made an unsuccessful attempt to revive D.J. At the time he was found, D.J. was no longer wearing his church clothes. Instead, he was wearing a red jogging suit.

On cross-examination, Anderson admitted that she had given the defendant permission to discipline D.J. by whipping him, but that she and the defendant had devised the alternative punishment of "bouncing." She further admitted that on the morning of D.J.'s death, she too had hit him. However, she testified that, excluding Sunday morning, she had not whipped D.J. in the last two weeks. She also admitted that she had a five thousand dollar ($5,000) life insurance policy on D.J. and that she had filed a claim. The claim had not yet been paid because of the present proceeding.

Anderson also informed the jury that she was being held at the Madison County Penal Farm as a material witness in this case. She testified that her failure to cooperate with authorities in Utah was the reason for her present incarceration.

Dr. Karen Hansen, a physician on the faculty of University of Utah and a member of the Child Protection Team at Primary Children's Medical Center in Salt Lake City, testified about the nature of D.J.'s injuries when he was hospitalized in August 1992. She testified that D.J. had had bruising to his right temple, right eyelid, and right ear lobe. He also had bruises on his abdomen and on his left elbow. Burn marks were detected on D.J.'s left buttock and lower left leg. He also had blistering burn marks on his shoulder, right buttock, and right heel. As a result of these injuries, an extensive skin graft was performed, and D.J. remained hospitalized for over a month.

Dr. Hansen testified that in her opinion the bruises and burns on D.J. had been clearly abusive. She testified that the bruises had been patterned and that there is no other way to get the patterned marks other than through inflicted injury. She also testified that earlobe bruises are classic examples of child abuse. Dr. Hansen further testified that the burns on D.J. were consistent with an immersion type of scalding injury.

Michael B. Morgan, director of training at Jackson Fire Department and a part-time paramedic with Medical Center EMS, testified that he and his partner were the first to respond to Anderson's call to 911. Morgan testified that when he had arrived, he found the defendant trying to perform CPR on D.J. He further testified that D.J.'s body had been very cold and that there had been obvious signs of rigor mortis. Will Helms and Joe House, Jackson Police Department officers, gave similar testimony about the condition of D.J.'s body.

Dr. Thomas K. Ballard, county medical examiner and coroner for Madison County, also testified about the condition of D.J.'s body. He testified that D.J. had had a bruise around his left eye, old burn scars on the back of his left foot, left ankle and lower left leg, fractures around his neck, small scratches on his face, an earlier scar on his right forehead, skin grafts on his left buttock and lower left back area, bruises on his buttocks, and a number of abrasions on his buttocks, arms, and legs. He opined that D.J. had died at least three hours before he examined him at 7:30 p.m.

Dr. O'Brien Cleary Smith, a forensic pathologist, performed an autopsy on D.J. at Dr. Ballard's request. Dr. Smith testified that D.J.'s death had been a result of blunt force injuries. He testified that multiple blows had caused internal bleeding which eventually led to death. During the autopsy, Dr. Smith divided D.J.'s injuries into categories according to the probable time the injury was received. In the category of months to

years, Dr. Smith noted scars with characteristics of a healing or healed burn. He also noted fine line-like scars which were characteristic of being switched or whipped with a branch or piece of wire. In the category of days to weeks, Dr. Smith noted skin abrasions on D.J.'s right thigh. In the six to twenty-four hour category, Dr. Smith noted a bruise near the left eye and an abrasion to the right forehead. In the category of two to six hours, Dr. Smith detected a bruise to the buttock area, an abrasion to the right neck, a bruise to the right hand, bruises on the right arm, three bruises to the head, a bruise above the left ear, and a bruise on the scalp. In the category of zero to two hours, Dr. Smith found two abrasions to the right neck, a bruise on the left forearm, and a bruise on the front right thigh.

Dr. Smith testified that D.J. had suffered multiple blows to the buttock area and as a result had bled to death. He testified that a number of small blood vessels had been broken by the blunt trauma. He testified that the bleeding had begun in the buttock region and that the bleeding had been so extensive that the blood made its way to the front of the body to show itself at the skin surface of the groin. Dr. Smith further testified that D.J. had likely lived somewhere between two and six hours before bleeding to death. He testified that the injuries would have been very painful to D.J. and would have caused him to want to stay very still. Dr. Smith testified that most likely D.J.'s heart began to race and his breathing began to hasten. Then, his heart slowed and he became cold and clammy or he may have been shivering in a cold sweat. Eventually, he began to lose consciousness and slipped into shock before dying. Dr. Smith testified that had D.J. received medical attention, he could have survived.

Dr. Smith also testified that some of D.J.'s injuries had had the characteristics of a defensive wound. He testified that the multiple circular bruises across the back of D.J.'s left forearm and bruises on the right wrist and arm had been most likely defensive wounds, but that he could not say for certain that

there was not another explanation for those injuries.

Dr. Smith further testified that D.J.'s most extensive injuries were to his lower back and buttocks region. He testified that the injuries could have been inflicted in a span of five minutes or over an extended period of time. Dr. Smith testified that of the several hundred autopsies he has performed concerning blunt trauma type injuries, D.J.'s injuries were the most severe injuries he had seen of this type. He further testified that these injuries had not been inflicted by accidental means.

Doris Jackson, an investigator with the Jackson Police Department, was next to testify. Jackson testified that she had gone to the house the day after D.J.'s death and had spoken to Anderson, D.J.'s mother. While at the house, Jackson retrieved D.J.'s black turtleneck, his underwear, and some socks. She testified that she had found the clothes in the dirty laundry basket and that all the clothes had been wet as if they had been washed and squeezed out. She further testified that she had observed a mucous type substance on the black shirt. These items were sent to the crime lab but nothing of evidentiary value was found. D.J.'s pants, which were found at the foot of his bed, were not sent to the crime lab.

Jackson also testified that on this same day she spoke to the defendant, read him his *Miranda* rights, and had him sign a rights waiver. Jackson then read to the jury the statement given to her by the defendant.[2] At the close of her testimony, the State rested.

The defendant called Sam Phelps, Jr., as his first witness. Phelps testified that he and the defendant had known each other for nearly fifteen years. He further testified that on November 20, 1994, the day of D.J.'s death, he had telephoned the defendant at home. He testified that he had called around eleven or twelve o'clock that morning and that he did not hear anyone in the background. He further testified that the defendant did not act out of the ordinary.

2. As the defendant's written statement is virtually identical to his testimony at trial, we will only include his testimony in this recitation of the facts.

Robert Williams, who had given the defendant janitorial work over the last three or four months, also testified that he had spoken to the defendant on that Sunday. Williams testified that he had telephoned the defendant around one o'clock to see if he could work. He testified that the defendant had said he was babysitting and could not work. Williams further testified that he did not hear anything in the background and that the defendant did not sound agitated.

A third witness, Sam L. Reeves, Jr., also testified that he had telephoned the defendant on that Sunday. He testified that he had called around 1:30 p.m. in order to talk about the football game. He testified that he had talked to the defendant for about an hour and that the defendant had not sounded upset or in any way unusual.

The defendant took the stand in his own defense. He testified that he had treated D.J. as if he were his natural son. He stated that they had played together, had gone to events, and in general, had had a good relationship. He testified that he had spanked D.J. one time with a belt, but that he mainly used his hand. He further testified that Anderson had not objected to his spanking D.J.

As to the incident in August of 1992, the defendant testified that D.J. had had little bumps on him that the defendant and Anderson discovered after Anderson had given D.J. a bath. He further testified that when these bumps turned into blisters and began to look much worse, he convinced Anderson to take D.J. to the hospital. He testified that he had not caused the injuries and that he did not know how they were caused.

As to the week preceding D.J.'s death, the defendant testified that Anderson had spanked D.J. for ten to fifteen minutes because of the note D.J. brought home from his teacher. The defendant testified that he no longer spanked D.J., but instead used an alternative method of punishment such as "bouncing" or standing in the corner.

The defendant testified that on the following Sunday morning, Anderson had been fussing at D.J. for being too slow to get ready for church. The defendant testified that he had told D.J. to start bouncing. He further testified that while D.J. had been bouncing, he hit his head on the bed rail, but that D.J. had said he was unhurt. The defendant testified that D.J. had bounced for ten to fifteen minutes and then had stopped. Anderson left to go to church shortly thereafter around 11:15 a.m. The defendant testified that he and D.J. then watched television in the defendant's bedroom. He testified that around 1:30 p.m. he had fixed lunch for D.J. Then at about 3:00 p.m., D.J. left the defendant's bedroom and went to his own room because he was sleepy. The defendant testified that he too then fell asleep and did not awaken until around 5:20 p.m. when the telephone began to ring. He further testified that he had remained in his bedroom and did not check on D.J. He stated that he had been in his bedroom when Anderson came home around 6:15 p.m.

He testified that after D.J. left his bedroom he had not heard any sounds from D.J.'s room. He further testified that D.J. had appeared to be fine the whole day. He testified that he had not struck or hit D.J. that day and that he had not caused the boy's injuries. However, he could not explain how D.J. had received the numerous injuries that ultimately caused his death.

## I. EVIDENCE OF D.J.'S PREVIOUS INJURIES

■ The defendant argues that the trial court erred when it permitted testimony regarding injuries suffered by D.J. two years prior to his death when the defendant had not been convicted of inflicting those injuries. This evidence was introduced through the testimony of Dr. Karen Hansen and Evangeline Anderson, D.J.'s mother. Both testified about the severe blisters and other injuries apparent on D.J.'s body in August of 1992. The defendant was charged with committing child abuse but he was not convicted.[3]

---

3. A trial was never held because Anderson left Utah and refused to return there to testify against the defendant. The charges were ultimately dismissed.

The Tennessee Supreme Court recently addressed this issue in the case of *State v. DuBose*, 953 S.W.2d 649 (Tenn.1997). In that case, the defendant had also been convicted of first-degree murder by aggravated child abuse. There, the trial court had admitted evidence of prior injuries suffered by the sixteen-month-old victim. The Supreme Court (Birch, J., dissenting) held that such evidence had been properly admitted and upheld the defendant's conviction.

In addressing the admissibility of the prior injuries, the Court first determined that the standard of review for evidentiary issues based on Tennessee Rules of Evidence 401[4] and 402[5] is abuse of discretion. The standard is the same for issues based on Tennessee Rule of Evidence 404(b)[6] if the trial court has followed the procedures mandated by that rule.

In this case, the evidence of prior injuries was the subject of a motion *in limine* prior to the trial. The trial court ruled that the evidence was admissible because this case was a "special situation." The trial judge stated that because the State had to prove that the child abuse was intentional and non-accidental, testimony about D.J.'s previous injuries would be admissible. He stated that witnesses could only testify as to what they actually observed about D.J.'s injuries. He also stated, "[i]n other cases this probably wouldn't be admissible, but where you've got to prove this child has been abused by something other than accidental means, I think these prior incidents have relevance, and the probative value outweighs the prejudicial effect." Thus, the trial court having substantially followed the mandates of Rule 404(b),

the standard of review is abuse of discretion. *DuBose*, 953 S.W.2d at 654. *See also State v. Brewer*, 932 S.W.2d 1, 24 (Tenn.Crim.App. 1996).

In *DuBose*, the Supreme Court divided the victim's injuries into two categories: those which the evidence did not show the identity of the person causing the injuries and those which the defendant could be identified as the person responsible for the victim's injuries. The injuries in *DuBose* that were not directly attributable to the defendant included injuries to the victim's abdominal area. The medical examiner testified that these injuries had been at least a week old and possibly as old as several months. She further testified that the older injuries compounded with the force of the newer ones on the day of the victim's death had caused the child to bleed to death. The Supreme Court determined that because the defendant had not been shown to have caused the initial injuries to the child's abdomen, the relevancy of the evidence should be tested under Tennessee Rules of Evidence 401 and 402, not 404(b). The Court then simply found that the evidence was relevant in that it showed causation. The Court then addressed the issue of whether the probative value of such evidence was outweighed by the danger of unfair prejudice. The Court again rejected Rule 404(b) and opted to use the more permissive test of Rule 403 since the evidence did not show the identity of the person who caused the abdominal injuries. The Court found the evidence admissible under that test.

The second set of injuries in *DuBose* was to the victim's head and hand. The injury

---

**4.** " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**5.** "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."

**6.** "(b) Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible

to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice."

occurred while the victim was in the care of the defendant. The emergency room physician who had examined the victim testified that the injury to the fingers was not consistent with an accident, but that it was possible that the victim could have inflicted the injury upon himself. As to these injuries, the Supreme Court stated that the defendant "*could* be identified as the person responsible for these injuries," and thus, the admissibility must be controlled by Rule 404(b). *DuBose*, 953 S.W.2d at 654 (emphasis added). The Court set out the following steps in order to ascertain whether such evidence is admissible:

> First, the evidence that the defendant was responsible for the hand and head injuries must be clear and convincing as required under Rule 404(b) analysis. Then, two issues must be determined: whether there was a material issue, other than conduct conforming with a character trait, to which evidence of the injury to the victim's fingers was relevant; and, if so, whether the probative value of the evidence outweighed the danger of unfair prejudice.... Under Rule 404(b), [unlike Rule 403,] the danger of unfair prejudice must simply 'outweigh' the probative value. The restrictive approach of Rule 404(b) recognizes that evidence of other crimes, wrongs or acts carries a significant danger of unfair prejudice.

*DuBose*, 953 S.W.2d at 654.

Accordingly, the Court found that the injuries to the victim's hand and head were related to two closely related material issues: intent and absence of accident. It further found that though the evidence was clearly prejudicial, it was not unfairly so. Thus, this evidence of previous injuries was admitted.

Turning now to the case before this Court, it appears that we must first determine the category in which to place D.J.'s prior injuries. From the evidence adduced at trial concerning D.J.'s injuries in August of 1992, it appears, in the language of *DuBose*, that the defendant "could be identified as the person responsible for these injuries." As in *DuBose*, the victim had been left in the care of the defendant shortly before the injuries were detected. The victim's mother had tes-

tified that after leaving D.J. alone with the defendant she had discovered bruises about his face and arms and "fine little bumps" that turned into serious blistering on his legs and buttocks. Dr. Hansen also testified about these injuries and stated that D.J.'s injuries had been consistent with a pattern of physical abuse. She testified that D.J.'s injuries had not been the result of an accident. Thus, following the *DuBose* rationale as we must, we conclude that these injuries fall in the second of the two injury categories.

We must now perform the step analysis from *DuBose* that is outlined above. First, the evidence that the defendant was responsible for the injuries must be clear and convincing. The evidence as to D.J.'s injuries was nearly identical to the evidence in *DuBose*. Since it appears that the Supreme Court considers this amount of evidence to be "clear and convincing," we too shall do the same. Next, we must address whether there was a material issue, other than conduct conforming with a character trait, to which evidence of the injury was relevant. Here, as in *DuBose*, the evidence was relevant to the issues of intent and absence of accident. The statute defining the offense with which the defendant was charged requires proof that the offense was committed "knowingly" and not by "accidental means." Thus, this evidence is clearly material. And finally, we must determine whether the probative value of the evidence was outweighed by the danger of unfair prejudice. Again, we turn to the *DuBose* Court which stated, "The evidence was highly relevant to material issues, it did not introduce any extraneous issues and it did not cause the jury to decide the case on an improper basis. On this record, the prejudice was not unfair." *DuBose*, 953 S.W.2d at 655 (citation omitted). Thus, following the holding in *DuBose*, we conclude that evidence of D.J.'s injuries in August of 1992 was properly admitted.

## II. ADMISSIBILITY OF PHOTOGRAPHS

■ The defendant next complains that the trial court erred in admitting into evidence five photographs taken of D.J. while he was hospitalized in Salt Lake City. The

five color photos depicted the severe burn injuries to D.J.'s buttocks and leg. From the above discussion, it is now clear that the subject matter of the pictures is admissible evidence. The question now becomes whether the photos were unfairly prejudicial because of their graphic nature.

The defendant claims that the photographs were "gruesome and graphic" and were unnecessary given the fact that Dr. Hansen's testimony was adequately descriptive. The State claims that because the photos were admitted for identification purposes only, there can be no error in admitting the photos. The record reveals that the photos were initially introduced and marked for identification only during a jury out hearing involving testimony from Evangeline Anderson. At that time, the district attorney said he did not plan on showing these five photos to the jury. He told the court that he would only pass two other photos to the jury, neither of which depicted the severe blistering. When the jury returned, Anderson's testimony resumed and only the two photos discussed above were shown to the jury.

Later, during Dr. Hansen's testimony, the five photos in question were again discussed. Dr. Hansen identified the photos as those taken while D.J. had been in the hospital in Salt Lake City. The discussion about these photos ended, and the record never reflected that they were made evidentiary exhibits or passed to the jury. However, during appellate oral argument, the defendant's attorney, who did not try the case, argued to this Court that in some trials, attorneys may fail to actually state in the record that exhibits are being passed to the jury. He argued that the photos likely were seen by the jury even though the record did not specifically state that the photos were passed. While we are aware that this may be so, and that it can be a particular problem when exhibits are marked for identification only, we do not think that that is the case here. The district attorney told the trial court that he did not intend to pass the photos to the jury, and the record does not reflect any departure from that intention. Thus, it appears that there can be no error when the jury did not even see these photos.

However, in the event that the record was inaccurate, we shall briefly address the merits of the defendant's argument. To be admissible, a photograph must be relevant to some issue at trial, and its probative value must outweigh undue prejudicial effect. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). The discretion of the trial judge in allowing the admission of a photograph into evidence will not be overturned except on a clear showing of an abuse of discretion. *Cagle v. State*, 507 S.W.2d 121, 132 (Tenn.Crim. App.1973). While these photos did depict the horrible injuries suffered by D.J., we cannot conclude that the trial judge abused his discretion in admitting the photos into evidence. Thus, we find no error even if the jury did see the photos, and again, we do not think that it did.

## III. EXPERT WITNESS

The defendant next complains that the trial court erred by allowing Dr. Karen Hansen to testify as a "child abuse expert." The record, however, makes it clear that the trial judge allowed Dr. Hansen to testify as a medical doctor and allowed her to testify about the types of injuries suffered by D.J. and the type of trauma that caused them. The trial judge stated, "Now, there isn't any recognized separate field as a child abuse doctor, but that doesn't mean a person can't give some expert testimony in that field." He further instructed the district attorney to tell Dr. Hansen that she could only testify as to what she observed and nothing more.

Dr. Hansen, a physician on the faculty of University of Utah and a member of the Child Protection Team at Primary Children's Medical Center in Salt Lake City, gave the court a detailed background of her experience in dealing with abused children. It is within the sound discretion of a trial court to determine whether an expert witness is qualified. Such a determination will not be disturbed on appeal absent a clear abuse of that discretion. *State v. Williams*, 657 S.W.2d 405, 411–12 (Tenn.1983). From our review of Dr. Hansen's qualifications, we find no abuse of discretion. The trial court did not err when it qualified Dr. Hansen to testify as a medical doctor as to her observations of

D.J.'s injuries. Likewise, we find no error in the trial court allowing Dr. Hansen, as a medical expert, to state her opinion as to the cause of those injuries. Dr. Hansen simply testified that she had observed bruises and burns on D.J. that appeared to have been abusive in nature because of the pattern marks of the injuries. The trial court did not err in allowing this witness to testify.

We note that the defendant also objected to Dr. Hansen's testimony on the basis of *State v. Ballard,* 855 S.W.2d 557 (Tenn.1993). In *Ballard,* the trial court allowed expert testimony about the symptoms of post-traumatic stress syndrome exhibited by the victims who were sexually abused by the defendant. 855 S.W.2d at 561. The Tennessee Supreme Court held that the evidence was inadmissible because "expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place." *Ballard,* 855 S.W.2d at 562.

*Ballard* is clearly irrelevant to the evaluation of the case now before us. Dr. Hansen did not testify about D.J.'s behavior, rather, she testified about the injuries that she observed. The trial judge specifically told her that she could only state an opinion if it were one based on her observation of the injuries. Dr. Hansen complied with the trial court's order and thus we find no error in allowing her to state her opinion.

## IV.  AGGRAVATING FACTORS

The defendant next complains that the trial court erred when it instructed the jury to consider the age of the victim as an aggravating factor. In ordering the defendant to serve life imprisonment without the possibility of parole, the jury based its decision on the presence of two aggravating factors: that the murder was committed against a person less than twelve years old and the defendant was eighteen years or older (T.C.A. § 39–13–204(i)(1)), and that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death" (T.C.A. § 39–13–204(i)(5)). The defendant argues that the victim's age was an essential element of the charged offense. He makes no challenge in his brief as to the other aggravating factor.

This Court's review of the sentence is limited. Tennessee Code Annotated § 39–13–207(g) provides that in reviewing the appropriateness of a jury determined sentence, this Court may not disturb a jury's determination unless the sentence was imposed arbitrarily so as to constitute a gross abuse of the jury's discretion.

The defendant was convicted under T.C.A. § 39–13–202(a)(4) (1994 Supp.) which provided that first-degree murder is "[a] reckless killing of a child less than sixteen (16) years of age, if the child's death results from aggravated child abuse, as defined by § 39–15–402, committed by the defendant against the child."

At trial, the judge instructed the jury that in order to find the defendant guilty of the above offense, it must find the following essential elements:

1.  That the defendant unlawfully killed the alleged victim;
2.  That the alleged victim was a child less than sixteen years of age;
3.  That the death of the victim resulted from aggravated child abuse committed by the defendant against the child; and;
4.  That the defendant acted recklessly.

Thus, the defendant alleges the aggravating factor related to age cannot be applied because the victim's age was an element of the offense.

This exact issue has not been addressed by our Supreme Court. Thus far, the Court has only discussed the issue of "double enhancement" as it applies in death penalty felony murder cases. *See State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). In *Middlebrooks,* the Court rejected the use of aggravating factor T.C.A. § 39–2–203(i)(7) to sentence a defendant to death by electrocution because the aggravating factor did not narrow the death-eligible class of defendants who are convicted of felony murder. 840 S.W.2d at 346. The Court stated that the class was not narrowed because the aggravating factor simply "duplicates the elements of the offense." *Middlebrooks,* 840 S.W.2d at

346. In this case, the State did not seek the death penalty, thus, we do not have the same concern as in *Middlebrooks*.

A panel of this Court has addressed the application of *Middlebrooks* to cases in which the State does not seek the death penalty and that panel concluded that *Middlebrooks* is distinguishable. In *State v. Frederick D. Butler, Dewayne B. Butler, and Eric D. Alexander*, No. 02C01–9604–CR–00128, 1997 WL 122247, Shelby County (Tenn.Crim.App., filed March 19, 1997, at Jackson)(perm. to appeal granted Nov. 3, 1997), the State filed an interlocutory appeal "to determine whether the felony murder aggravating circumstance can be used to enhance a life sentence to a life sentence without the possibility of parole in a felony murder case when the state does not seek a death sentence." The panel held that the aggravating circumstance could be used and stated:

> This case is distinguishable from *Middlebrooks*. Here, there is no United States or Tennessee constitutional provision, statute, rule, or common law decision which requires the class of defendants eligible for a life sentence without the possibility of parole to be narrowed. Contrary to the defendants' argument, the General Assembly cannot be said to have adopted *Middlebrooks* when creating the penalty of [life] without the possibility of parole. *Middlebrooks* addressed instances where the death penalty is imposed after the defendant has been convicted of first degree felony murder. Thus, *Middlebrooks* is limited in scope to capital cases. Because the penalty sought in the case *sub judice* is life without the possibility of parole, the holding in *Middlebrooks* does not bar the use of aggravating circumstance (i)(7) to enhance a life sentence to life without the possibility of parole following a conviction for felony murder.

*Butler* at 7–8. Thus, in applying the above analysis, we see nothing to prohibit the use of aggravating circumstance (i)1 in the case now before us. *But cf. State v. James Lloyd Julian, II*, No. 03C01–9511–CV–00371, 1997 WL 412539, Loudon County (Tenn. Crim.App., filed July 24, 1997, at Knoxville)(pet. to rehear denied Sept. 3, 1997)(perm. to appeal filed Oct. 30, 1997). Therefore, we find no error in the jury's finding beyond a reasonable doubt that aggravating circumstance (i)1 did exist.

We further note that the use of this aggravating circumstance is not "double enhancement" in this case. The statutory age element is a child less than sixteen years of age while the aggravating circumstance age element is a person less than twelve years of age. Thus, had the defendant been convicted of first-degree murder by aggravated child abuse of a fourteen-year-old child, the aggravating circumstance could not apply. In addition, the aggravating circumstance requires another element, that is, that the defendant must be eighteen years old or older. Therefore, it is our conclusion that this circumstance applies to this defendant regardless of any arguments about "double enhancement."

In order for a defendant to be sentenced to life imprisonment without the possibility of parole, the jury must only find one statutory aggravating circumstance beyond a reasonable doubt. T.C.A. § 39–13–204(i). Having determined that the first aggravating circumstance was correctly applied, and the defendant not having challenged the other circumstance, we find the statutory burden has been more than met.

The defendant's fifth issue, that his sentence is excessive, has been thoroughly discussed above and we see no reason to further address the defendant's sentence. The jury's sentence was not imposed arbitrarily, and we find no abuse of the jury's discretion. *See* T.C.A. § 39–13–207(g).

We also see no reason to further discuss the defendant's sixth issue, which is, given the erroneous rulings by the trial court, the evidence is insufficient to sustain the defendant's conviction. Having determined that the defendant's complaints of erroneous rulings were all without merit, this issue is mute. We note however, that the evidence presented at trial was overwhelmingly sufficient to convict the defendant of the crime for which he was charged.

Thus, for the foregoing reasons, we affirm both the defendant's conviction and his sen-

tence of life imprisonment without the possibility of parole.

WADE and HAYES, J., concur.