IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2002 Session

## STATE OF TENNESSEE v. VENITA MICHELLE BURCHELL

**Appeal from the Criminal Court for Davidson County**
**No. 99-D-3069    Seth Norman, Judge**

---

**No. M2001-02153-CCA-R3-CD - Filed November 13, 2002**

---

Venita Michelle Burchell appeals from her aggravated child abuse and criminally negligent homicide convictions. Her convictions result from a jury trial in the Davidson County Criminal Court pertaining to fatal injuries inflicted upon Nicholas Boyd Cotton, who was sixteen months old at the time of his death. Ms. Burchell urges us to find error in the lower court's acceptance of the verdict, the admission of prior bad act evidence, and the limiting of defense expert testimony. Because no harmful error occurred, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Edward S. Ryan, Nashville, Tennessee, for the Appellant, Venita Michelle Burchell.

Paul G. Summers, Attorney General & Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin Miller and Philip Wehby, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

During the last few months of his brief life, sixteen-month-old Nicholas Boyd Cotton's care was entrusted to the defendant while Nicholas' parents were at work. Nicholas' father, Jonathan Cotton, worked with the defendant's husband, and through this acquaintance Nicholas' parents agreed to hire the defendant to babysit Nicholas during working hours. The defendant kept Nicholas in her apartment, and her own two children were also present daily.

On the morning of November 17, 1999, Jonathan Cotton took his wife, Rachelle Cotton, to work, and while he was gone from their apartment, his brother and sister-in-law, David and Christy Cotton, cared for Nicholas. David and Christy Cotton were temporarily residing with Jonathan and Rachelle Cotton, and they babysat Nicholas in Jonathan and Rachelle Cotton's

apartment. After taking his wife to work, Jonathan Cotton returned to the apartment, gathered Nicholas and his belongings, took Nicholas to the defendant's apartment, and departed at about 8:15 for his job as a maintenance technician at the apartment complex. According to all four of the adult Cottons, Nicholas did not display any out-of-the-ordinary behavior before he left the Cotton apartment that morning.

Sometime between 9:00 and 9:45 a.m., the defendant summoned her husband, David Burchell, to return to their apartment. Within about five minutes, Mr. Burchell summoned Jonathan Cotton to the apartment. When Mr. Cotton arrived, Mr. Burchell was holding Nicholas, who was gasping for air and unconscious. Emergency personnel arrived within minutes and transported Nicholas to Vanderbilt Hospital, where doctors diagnosed significant closed head injuries. Nicholas' situation worsened, and he was eventually pronounced brain dead. Life support was terminated on November 21, 1999, and Nicholas died.

Detective Ron Carter of the Metro Police Department spoke with the defendant on the day of Nicholas' injuries. The defendant told Detective Carter that immediately prior to Nicholas' injuries, he had been throwing a temper tantrum, and she made him stand in a corner in the living room while she went into the kitchen. As she was returning to the living room, he "[t]hrew himself back and hit his head" on the carpeted floor. She went to check on him, and he was blinking and looking at the ceiling. She described him as "dazed." She claimed that she picked him up, and within a minute he started vomiting. At first she thought he was having a seizure. The defendant repeatedly denied that she hit Nicholas. Upon further questioning by Detective Carter, the defendant eventually admitted that she "made him sit down . . . probably a little roughly." She maintained at first that she did not know how Nicholas had been bruised in and behind his ear, but she eventually admitted that she had "grabbed his face by his ears" when she was "trying to talk to him, trying to make him look at [her] to calm down." She claimed that she made him sit down "by his ears." She eventually conceded that she might have brought her hand up too hard. Also, she admitted that she was angry at the time.

At trial, the state presented the testimony of Rachelle and Jonathan Cotton, Nicholas' parents. They testified generally to their son's pleasant disposition and the absence of anything out of the ordinary with respect to his health and disposition on the date in question. Mrs. Cotton testified that she and her husband had not authorized the defendant to discipline Nicholas by putting him in "time out," and upon learning that the defendant had done so on a prior occasion, she and her husband told the defendant not to do it again.

Christine Kristufek, a pediatric nurse practitioner employed by Gallatin Children's Clinic, testified that Nicholas had been seen in that office regularly for well-child visits, the last occasion being in October 1999. He was a healthy, normal child. There was no record of any prior trauma.

The state also presented the testimony of Christy and David Cotton, who were living with Rachelle and Jonathan Cotton and had babysat Nicholas briefly before Jonathan Cotton took

Nicholas to the defendant's house that morning. Their testimony was that Nicholas appeared normal and healthy at that time.

Doctor Mark Thomas Jennings, a pediatric neurologist and one of Nicholas' attending physicians following his injuries, testified Nicholas suffered a coup injury to or around the left ear, and then, the right side of the head impacted against an object, causing a contracoup injury. This jarred the brain within the head and caused tissue around the brain to bleed and produced bleeding in the retina. Nicholas' retinal injuries were indicative of an acceleration/deceleration injury, wherein the head is thrown forward and suddenly stopped by an object. In the absence of a history of a motor vehicle injury, which would normally be associated with an injury of this nature, this type of injury is indicative of a very significant non-accidental trauma. The history that Dr. Jennings had of Nicholas falling onto a carpeted floor from a high chair was not consistent with the magnitude of the injury.

Doctor Joseph Gigante, a pediatrician who treated Nicholas following his injuries, testified that Nicholas had injuries consistent with blunt force trauma to the head. He had a subdural hematoma, a common injury in child abuse victims, and he had symptoms consistent with shaken impact syndrome, which refers to the shaking of a child in combination with the child's head coming into contact with a static object. According to Dr. Gigante, Nicholas' injuries were not consistent with a history of falling from a high chair or onto a carpeted floor. Doctor Gigante, along with Nicholas' other treating physicians, concluded that the child probably received a blow to the left side of his head, with his brain bouncing off the right side of his head, thereby causing the injuries. Retinal hemorrhages like those Nicholas had, in the absence of trauma or other medical problems, almost invariably indicate child abuse. Doctor Gigante testified that he could not imagine that Nicholas was asymptomatic for a couple of hours following his injuries. Doctor Gigante opined that Nicholas had been a victim of child abuse.

Doctor John Gerber, a forensic pathologist, testified that he performed an autopsy on Nicholas. Based on that examination, he determined that the cause of death was multiple blunt force injuries to the head. He testified in detail about the various injuries Nicholas sustained, and he opined that they were not consistent with Nicholas having fallen backwards and having hit his head on a carpeted floor. Rather, some other significant force would have been required to create injuries of the magnitude exhibited. He further opined that injuries of this magnitude would cause immediate symptoms, and there was not a possibility of even a one to two hour delay in the onset of symptoms.

Catherine Norris, a neighbor of the defendant, testified over defense objection that one month prior to the date on which Nicholas was injured, she had witnessed the defendant walking up the sidewalk to her apartment with the victim and two little girls. Once inside the open doorway of her apartment, the defendant repeatedly "hit" Nicholas very hard with her left hand while he was on the floor. When the defendant saw Ms. Norris watching, she kicked the door of her apartment closed. Ms. Norris was disturbed enough about this incident to call the apartment complex manager. She did not, however, report this incident to the police until after Nicholas' death.

In response to the state's proof, the defendant offered evidence minimizing her culpability for Nicholas' injuries and death.

David Burchell testified that Nicholas was usually fussy in the mornings, and he was crying on the morning of November 17 when Mr. Burchell went to the apartment about 9:30 to retrieve his radio. He testified that when he returned to the apartment a second time later that morning, Nicholas was limp, unresponsive, and breathing strangely; however, he did not have any signs of injury, nor was the apartment in disarray. Mr. Burchell acknowledged that his wife had not called 911 prior to his return to the apartment. He claimed that the defendant was a fantastic mother, and he had no complaints about the way in which she cared for their children. He admitted, however, that his wife had an anger problem, although he had never seen her manifest this on a child. He also admitted that he was aware of an incident in which the defendant had patted Nicholas on his diaper, and he had discussed this incident with Jonathan Cotton. He said that his wife had been cooperative with the police investigation following Nicholas' injuries.

Lewis Toth testified as a character witness for the defendant. He claimed that she had babysat for his grandchildren, and he was always very happy with her services. He would not have a problem letting her babysit his grandchildren even following the incident with Nicholas.

Doctor Jan Edward Leestma, an anatomic pathologist and neuropathologist, testified as a defense expert. He contradicted the state's witnesses who said that Nicholas' injuries were not consistent with a backwards fall from a standing position or from a high chair. Rather, Dr. Leestma opined that either could result in serious injuries. He testified that medical literature contains reports of similar incidents resulting in serious injuries, including one report of a child of similar age and size to Nicholas dying as a result of a two and one-half foot fall. Doctor Leestma further opined that an individual might suffer injuries yet exhibit no symptoms for an hour, two hours, or even a day. Thus, he opined that it was "possible" that Nicholas had sustained a head injury prior to his arrival at the defendant's apartment on November 17. On cross-examination, Dr. Leestma admitted that he had not talked with the victim's treating physicians and that he had written professionally in 1985 that child abuse would be suspected in cases similar to the victim's. He maintained that due to the advance of medical science since 1985, he now believed it possible that the defendant's injuries resulted from accident.

Finally, the defendant took the stand in her own defense. She said that Nicholas was cranky and lethargic on the morning of November 17. She sat with him for a time, and when she eventually got up, he fussed. She grabbed the sides of his head with her hands. She conceded that she might have done this with too much force and caused a bruise on Nicholas' head, but that she had not meant to use that amount of force. She told Nicholas to stop crying, and he responded by screaming. She became frustrated and told Nicholas to go to the corner. She realized she needed to get away from him before she became too frustrated, so she walked into the kitchen. She was walking back into the living room when she saw him stiffen up and throw himself backwards, hitting his head on the floor. Nicholas stopped crying. He blinked as if he was dazed. She lifted him, and

he vomited on her shoulder. His breathing became difficult, and he went limp. She summoned her husband, then 911, and then Jonathan Cotton.

The defendant testified that she was confused during questioning by Detective Carter, and when she told him that she felt responsible, she meant that she felt responsible for Nicholas because he was in her care, not because she had injured him. She claimed to have had no intent to hurt Nicholas. She also claimed that she had been babysitting children since she was thirteen years old and had never previously been accused of any inappropriate behavior toward her charges, nor had other children been injured while in her care.

The defendant testified that she did not know why some of the medical personnel obtained a history of Nicholas having falling from a high chair, as she did not own one.

With respect to the October incident about which Catherine Norris had testified, the defendant explained that her two children and Nicholas had gone outside and headed toward the street after her older child was able to open the apartment door. After the defendant returned the three children to her apartment, she spanked them. She spanked Nicholas with her hand on his diaper. She claimed that she reported the incident and spanking to Jonathan Cotton, and the Cottons chose to continue placing Nicholas in her care.

On this proof, the jury found the defendant guilty of aggravated child abuse and criminally negligent homicide. At a later date, the trial court imposed a one-year, Range I sentence for criminally negligent homicide and a 22-year sentence as a Violent Offender for aggravated child abuse. The court ordered that the sentences be served concurrently.

Following an unsuccessful motion for new trial, the defendant filed this appeal. She claims that the trial court failed to discharge its function as thirteenth juror given the evidence presented, that the court erred in admitting Catherine Norris's testimony, and that the court improperly limited the testimony of Dr. Leestma.

**I**

First, we consider the defendant's claim that the trial court did not discharge its duty as thirteenth juror because had it done so, it would not have accepted the verdict. Given the manner in which the defendant has presented the issue, we view our duty of appellate review as being two-fold. We will first determine whether the trial court discharged its function as thirteenth juror. If it did, we will then consider whether the evidence sufficiently supports the verdict.

Rule 33(f) of the Rules of Criminal Procedure imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Under the Rule, the judge is empowered to grant a new trial if he disagrees with the jury about the weight of the evidence. Tenn. R. Crim. P. 33(f). "Rule 33(f) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a

motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." *Carter*, 896 S.W.2d at 122. Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. *Id*. Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431 (Tenn. 1995).

In the present case, the court explicitly stated its satisfaction with the verdict on the record. The trial judge said, "I'm satisfied with the verdict in this matter . . . ." Nothing could be plainer. The court discharged its duty as thirteenth juror, just as it was required to do.

Having determined that the court properly exercised its duty as thirteenth juror, we move on to the second component of the defendant's issue, which pertains to the sufficiency of the convicting evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 8 (Tenn. 2000).

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. at 484, 470 S.W.2d at 613.

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

The defendant in this case was convicted of aggravated child abuse and criminally negligent homicide. A person commits aggravated child abuse who "knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury . . . so as to adversely affect the child's health and welfare" and "[t]he act of abuse or neglect results in serious bodily injury to the child." Tenn. Code Ann. §§ 39-13-401 (Supp. 2001) (child abuse and neglect); 39-13-402(a)(1) (Supp. 2001) (aggravated child abuse and neglect). This crime is a Class A felony if the child is no more than six years old. *Id.* § 39-13-402(b).

In the light most favorable to the state, the trial evidence demonstrated that the defendant became frustrated with the victim and handled him roughly. She was the only adult with the victim at the time. Multiple physicians opined that the victim's injuries could not have occurred as the defendant described. Shortly after the incident, the defendant admitted that she had an anger problem. Circumstantially, the proof points unerringly to the defendant as the individual who non-accidentally injured the victim.

The defendant was also convicted of criminally negligent homicide, defined as "[c]riminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212(a) (1997). Circumstantially, the evidence in the light most favorable to the state demonstrates that the defendant acted with a *mens rea* of at least criminal negligence when she injured the victim, and those injuries ultimately led to his death. Thus, the evidence is sufficient to sustain the homicide conviction, as well.

In her brief, the defendant expresses concern that the jury was uncertain of the evidence, claiming that if the jury found her guilty of aggravated child abuse, a companion finding of felony murder necessarily would follow. However, this court is untroubled by the apparent inconsistency in the verdicts given the sufficiency of the evidence on both counts. *See, e.g., Wiggins v. State*, 498 S.W.2d 92 (Tenn. 1973); *State v. Hayes*, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999). Indeed, the defendant was the beneficiary of the jury's finding of guilt of the lesser offense of criminally negligent homicide, as opposed to the greater offense of felony murder, given that the evidence supported a finding of either.

## II

We next consider the defendant's argument that the lower court erroneously admitted the testimony of Catherine Norris that she witnessed the defendant repeatedly strike the victim one month prior to the event on trial. When the state proffered this evidence, its premise for admission was that the event about which Ms. Norris would testify demonstrated the defendant's intent and absence of accident regarding the incident on trial. The defense objected, arguing that the evidence was more prejudicial than probative because a single, isolated incident a month prior to the incident

on trial failed to demonstrate a pattern of abuse or neglect, and at that point in the trial,[1] there had been no defense theory advanced that the incident was the result of mistake or accident. Following a jury-out hearing, the court allowed admission of the evidence, finding that its probative value on the issues of intent, absence of mistake, opportunity, or common scheme or plan outweighed the evidence's prejudicial effect. The court relied upon Tennessee Rule of Evidence 404(b) as the basis for admission.

As a general proposition, evidence of a defendant's prior crimes, wrongs or acts is not admissible as character evidence of the defendant to prove that she committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon her bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.*; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Nevertheless, evidence of a defendant's prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b).

In Tennessee, evidence of a criminal defendant's character may become admissible when it logically tends to prove material issues which have been divided into three categories: (1) the use of "motive and common scheme or plan" to establish identity, (2) to establish the defendant's intent in committing the offense on trial, and (3) to "rebut a claim of mistake or accident if asserted as a defense." *McCary*, 922 S.W.2d at 514. In order for such evidence to be admitted, the rule specifies three prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and,

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other act. Tenn. R. Evid. 404, Advisory Comm'n Comment; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

---

[1]The evidence was offered during the state's case-in-chief. Prior to Ms. Norris' testimony, the state had introduced into evidence the defendant's pretrial statement, in which she had made the claim of accident.

On appellate review of a trial court's decision to admit or exclude evidence, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs or acts under Rule 404(b), its determination is entitled to deference when, as in the case at bar, it has substantially complied with the procedural requisites of Rule 404(b). *See DuBose*, 953 S.W.2d at 652.

The defendant claimed in a pretrial statement to Detective Carter first that the victim injured himself. She admitted later in the same statement that she had been rough with victim and forced him to sit down, but she maintained that she had no intent to injure him. She steadfastly maintained that she did not willfully strike the victim with great force, although she inadvertently might have used more force than she should have. The code proscribes as child abuse knowingly treating a child "*other than by accidental means,*" in a manner that results in serious bodily injury to the victim. Tenn. Code Ann. §§ 39-15-401 (Supp. 2001); 39-15- 402 (Supp. 2001) (emphasis added).

In child abuse and child abuse homicide cases, Tennessee appellate courts have applied principles of Evidence Rule 404(b) to approve the use of evidence of the defendant's prior abuse of the victim. *See, e.g., DuBose*, 953 S.W.2d at 654 (evidence that the defendant had previously injured the victim's hand and head "was relevant to two closely related material issues: intent and absence of accident"); *State v. Evangeline Combs*, No. E2000-0281-CCA-R3-CD, slip op. at 53 (Tenn. Crim. App., Knoxville, Sept. 25, 2002) (despite the defendants making no claim of accident in injuring child victim, evidence was admissible to show that the defendants injured the victim "knowingly, which clearly infers *non-accidental* conduct," as a means of proving the offense of aggravated child abuse") (emphasis in original); *State v Lacy*, 983 S.W.2d 686, 693 (Tenn. Crim. App. 1997) ("[A]s in *DuBose*, the evidence [of the defendant's prior assaults against the victim] was relevant to the [material] issues of intent and absence of accident.").

We believe, however, that these cases are factually distinguishable from the present case; in the child abuse cases we have reviewed, the use of evidence that the defendant abused the child before he or she committed the assault under review was accompanied by contextual facts. These facts helped to guide an inquiry into the defendant's intent or lack of accident or mistake in the case on trial. For instance, in *DuBose*, the trial court admitted evidence that, at different times prior to the day of the fatal assault upon the sixteenth-month-old victim, the defendant, who was the live-in boyfriend of the victim's mother, had injured the victim's hand and his head, the latter resulting in "the development of scar tissue between the scalp and the skull," and that the defendant was hostile toward the victim because he reminded the defendant of the victim's father, whom the defendant disliked. *DuBose*, 953 S.W.2d at 651. In light of the relationship of the defendant to the victim and to his mother and that the prior assaults resulted in injuries to the victim, proof of the "injuries was highly probative of both his intent to harm the child and also that the fatal injury was not accidental." *Id.* at 654.

In *Evangeline Combs,* this court approved the state's use of extensive "background" evidence that included evidence of long-term abuse inflicted upon a then minor victim. The court found that "evidence of the Defendants' hostility and abusive behavior toward [the victim] is relevant to demonstrate their intent to confine or imprison her [and their] guilty knowledge that their actions caused serious bodily injury, and rebuts any notion that the systematic, long-term abuse of the victim was an accident or mistake." *Evangeline Combs*, slip op. at 53.

In *Lacy*, the evidence showed that the five-year-old victim bled to death as a result of "multiple blows to the buttock area." *Lacy*, 983 S.W.2d at 690. The trial court admitted evidence that two years before the fatal injuries were administered, the defendant, who was the boyfriend of the victim's mother, had inflicted numerous injuries upon the victim, including "bruising to his right temple, right eyelid, and right ear lobe . . . [and b]ruises on his abdomen and on his left elbow[, b]urn marks . . . on [the victim's] left buttock and lower left leg[,] blistering burn marks on his shoulder, right buttock, and right heel." *Id.* at 689. The medical expert who described these injuries opined that they were "consistent with *a pattern of physical abuse*." *Id.* at 693 (emphasis added).

We are struck by salient distinctions between these cases and the present case. In the present case, the state offered, without contextual information, evidence of a solitary incident that occurred a month before the victim received his fatal injuries. This proof showed that the defendant hit the victim with her hand, but there was no proof that the incident resulted in injuries to the victim or that the striking resembled the later fatal assault. Although Ms. Norris described the blows as repeated and forceful and testified that she was angered enough to discuss the event with her husband and to call the apartment manager, she did not *per se* articulate the striking as brutal or excessive. The state illustrated no other instances of the defendant striking the victim, and no pattern of such conduct was implicated. Moreover, the defendant had no familial or other close relationship with the victim from which emanated chronic hostility toward the victim.

Under the circumstances, we hold that the isolated incident narrated by Ms. Norris should not have been admitted; it was not relevant to establish that the defendant acted knowingly when she fatally injured the victim or to rebut the defendant's claim of accidental injury. We believe that the findings of the *Dubose*, *Lacy*, and *Evangeline Combs* courts are buttressed by the presence of multiple assaults or an abusive pattern that resulted in visible injuries or scars, belying a claim that a later injury was the result of accident by showing a history of ill will toward the victim. We doubt that an out-of-context, isolated incident fails to illustrate much of anything except that the defendant is the kind of person who bears ill will toward small children – in other words, that she had the propensity to injure the victim and cause his death.

Courts should be wary of Rule 404(b) evidence that is offered for other purposes than propensity but which, in reality, involves no other logical progression between the prior bad act and the crime under review and merely masks propensity as the connection between the two. *See State v. Leslie Brian Willis*, No. 01C01-9802-CC-00068, slip op. at 11 (Tenn. Crim. App., Nashville, July 15, 1999) (finding no cause-and-effect relationship between a prior rape against a different victim and the felony murder by rape on trial, "only the extrapolation that, if the defendant intended rape

of a female in 1985, he must be the sort of person who intended to rape [the victim in the current case]", *perm. app. denied* (Tenn. 2000). If the conclusion is connected to the premise only by the vehicle of propensity, Rule 404(b) is generally breached. "Propensity evidence by any other name is still propensity evidence, and evidence that is propensity evidence only is inadmissible." *Leslie Brian Willis,* slip op. at 11. Thus, the trial court erred in allowing Ms. Norris' testimony.

Now, we must determine whether the error requires reversal of the defendant's convictions. *See* Tenn. R. Crim. P. 52(a) (precluding reversal on appeal unless the error "affirmatively appear[s] to have affected the result of the trial on the merits"); Tenn. R. App. P. 36(b) (precluding reversal on appeal unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). We observe that the state presented a strong case, which included the defendant's pretrial statement wherein she made inculpatory admissions. The state's medical evidence was influential, as contrasted with the defendant's medical proof, which appears to have been substantially impeached. Despite the considerable weight of the state's case, the jury acquitted the defendant of felony murder predicated upon child abuse and of lesser-included offenses -- convicting her of the least culpable lesser-included homicide offense of criminally negligent homicide, an offense that is essentially bottomed on accident as a theory of homicide. Even though the jury convicted the defendant of the aggravated child abuse charge, we are strongly influenced by its verdict on the homicide charge that it was not unduly or unfairly affected by Ms. Norris' testimony. Accordingly, we conclude that the error was harmless.

For these reasons, we decline to find reversible error in the admission of Ms. Norris's testimony.

### III

Finally, the defendant claims that the trial court erred in ruling that Dr. Leestma, the defense expert, could not testify to his opinion regarding the cause of the victim's death. Under Tennessee law, expert testimony may be admitted if it will "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. An expert witness is one who is qualified "by knowledge, skill, experience, training or education." *Id.* Admission of expert testimony is a matter within the discretion of the trial court, and that discretion will not be disturbed on appeal unless it has been abused. *Coe v. State*, 17 S.W.3d 193, 226-27 (Tenn. 2000); *State v. Begley*, 956 S.W.2d 471, 475 (Tenn. 1997).

In this case, however, we are unable to review the lower court's exercise of discretion in excluding Dr. Leestma's testimony. The record before us contains no defense proffer of what Dr. Leestma's testimony would have been with respect to the matters about which he was not allowed to testify. As our supreme court has observed,

> In order for an appellate court to review a record of excluded evidence, it is
> fundamental that such evidence be placed in the record in some manner. When it is

a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced. *When, however, it consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.*

*State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986) (emphasis added). We hold that the defendant waived appellate review of this issue by failing to preserve Dr. Leestma's proposed opinion testimony on the record.

We note additionally that the record contains no indication that the defense contested the medical examiner's testimony regarding the cause of death, that being multiple blunt force injuries to the head. Rather, the true issue in this case focused on the mechanism by which the victim received those injuries. Thus, in the absence of an offer of proof of Dr. Leestma's proposed testimony, we are at a loss to conjecture how his testimony might have changed the course of the trial.

Finding no harmful error, we affirm.

_____
JAMES CURWOOD WITT, JR., JUDGE