# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 11, 2001

## DANNY RAY LACY v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C99-144     Joe C. Morris, Judge**

---

**No. W2000-01898-CCA-R3-PC  - Filed June 7, 2001**

---

The petitioner appeals the post-conviction court's denial of his petition for post-conviction relief. After review, we hold that the record supports the post-conviction court's finding that trial counsel was not ineffective in failing to obtain the 911 tape; was not ineffective in preparing a defense; was not ineffective for failing to introduce fingernail samples taken from the petitioner; and was not ineffective for failing to adequately develop the victim's mother as a suspect.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOE G. RILEY and ROBERT W. WEDEMEYER, JJ., joined.

Mark A. Mesler, Memphis, Tennessee, for the appellant, Danny Ray Lacy.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner, Danny Ray Lacy, was convicted by a Madison County jury of first degree felony murder in the perpetration of aggravated child abuse, resulting in the death of David Hammond, Jr. (hereafter "D.J."), his girlfriend's five-year-old son.  A jury sentenced him to life without the possibility of parole.  That judgment was affirmed on direct appeal.  State v. Lacy, 983 S.W.2d 686 (Tenn. Crim. App. 1997), perm. appeal denied, (Tenn. Sept. 21, 1998).

The petitioner filed a timely petition for post-conviction relief, was appointed counsel, and had an evidentiary hearing.  In his petition, he asserted that trial counsel was constitutionally

ineffective for numerous reasons. After the evidentiary hearing, the post-conviction court dismissed his petition. He now appeals that dismissal and asserts that he received ineffective assistance of counsel because trial counsel failed to obtain a 911 tape from the incident, inadequately prepared for trial, and failed to present potentially exculpatory evidence.

## Facts

For purposes of evaluating the petitioner's claim, below we provide a summary of the facts as adduced by this court on direct appeal.

Evangeline Anderson, D.J.'s mother, began dating the defendant in April of 1991 while living in Jackson, Tennessee. A short time later, she visited her brother in Salt Lake City, Utah, and decided to move there. The defendant joined Anderson and D.J. in Salt Lake City about a month later. At the defendant's trial, Anderson testified that the defendant and D.J. had laughed and talked and that they had played together. The defendant was not D.J.'s natural father.

On March 22, 1992, while the trio was living in Salt Lake City, the defendant became angry at D.J. for wetting his pants. Anderson testified that even though D.J. had not been quite two years old, the defendant had become angry at D.J., pulled down his pants, and whipped him with a switch. Anderson testified that she had told the defendant to stop but that he had refused. She further testified that she had attempted to call the police but that the defendant had thrown the telephone at her. Anderson testified that the defendant had then hit D.J. in the head with the television remote control. Anderson then grabbed her son and fled the residence. She testified that D.J. had had marks on his body from being hit by the switch and had a little blood by his nose. She and D.J. returned to Jackson the next day.

However, the following month, Anderson and D.J. returned to Salt Lake City and began living with the defendant once again. Anderson testified that the defendant had said he was sorry for the way he had treated D.J. and that there were no further problems until August 1992.

One afternoon in August of 1992, Anderson left D.J. in the defendant's care while she went to her job at a convenience store. She testified that when she arrived at home after work, she noticed bruises on D.J.'s face and arms. Anderson testified that she had questioned the defendant about the bruises and that he had said he had to whip D.J. because he was being bad. She testified that the next day she had noticed some "fine little bumps" on D.J. She also noticed some red marks on his back. She purchased some cream and applied it to the bumps. On the third day, as she was giving D.J. a bath, Anderson noticed blisters on D.J.'s legs and buttocks. D.J. was then taken to the hospital where he remained until the end of September. Anderson testified that she had asked the defendant about the origin of the blisters but he had

no explanation. However, Anderson testified that the defendant had later told her the marks on D.J.'s body were made when the defendant hit D.J. with a brush.

Because of the unexplained injuries to D.J., Anderson lost custody of her son. Her mother, Virginia Anderson, later gained custody of D.J. and cared for him in her home in Jackson. Evangeline Anderson then left Utah in October of 1992 and moved in with Virginia Anderson and D.J. in their home in Jackson. The defendant also returned to Jackson at this time and lived with his mother. He and Evangeline Anderson continued to date each other and in March 1993, they began to live together. D.J. joined them shortly thereafter. While living together, Anderson and the defendant devised a form of discipline for D.J. called "bouncing." Anderson demonstrated this technique for the jury. The punishment apparently amounted to squatting to the knees and bouncing up and down. She testified that she and the defendant would make D.J. "bounce" for ten to fifteen minutes rather than whipping him. However, she admitted that she did still whip him from time to time.

On November 17, 1994, Anderson received a note from D.J.'s kindergarten teacher saying that D.J. had been disrupting class by talking too much. Anderson testified that because of the note, the defendant whipped D.J. with a belt leaving marks on D.J.'s legs, neck, and back. She testified that she had told him to stop, but the defendant refused. The next day, Anderson picked D.J. up at school and spoke to his teacher, Stephanie Lynn Stephens Beasley, about the earlier note. Ms. Beasley testified that during the conversation, she had asked Anderson about the marks on D.J. and that Anderson had admitted to whipping the child. Ms. Beasley further testified that Anderson had said she whipped D.J. good and that she had raised her arm about her head and had said she had it up to here with him. At trial, Andersen said she did not remember making such remarks.

On Sunday, November 20, 1994, Anderson began getting ready for church. She testified that D.J. had been eating his breakfast slowly and that this had angered the defendant. As a result, the defendant made D.J. start "bouncing." Anderson testified that while D.J. had been bouncing, the defendant had hit D.J. with his hand, causing him to fall over. Despite already being dressed in his church clothes, a black turtleneck and black pants with white specks, Anderson decided to leave D.J. at home. She testified that the defendant and D.J. had talked and that everything seemed all right. She then left the house around 11:00 a.m. and went to church.

Anderson testified that she did not return home from church until about ten after six o'clock that evening. She testified that she entered the house through the back door and then went into the bedroom she shared with the defendant. She testified that the defendant had been lying on the bed watching television. She showed the defendant a suit that someone had given her at church for D.J. and then called D.J.'s name in order to show him the suit too. When D.J. did not answer, Anderson went into D.J.'s

bedroom and turned on the light. When she could not get a response from D.J. she yelled to the defendant that D.J. was not breathing. Anderson testified that she had then called 911. She further testified that the defendant had taken the phone from her and had begun to talk to the operator. The operator instructed the defendant to perform CPR which the defendant attempted to do. Shortly thereafter, emergency personnel arrived and made an unsuccessful attempt to revive D.J. At the time he was found, D.J. was no longer wearing his church clothes. Instead, he was wearing a red jogging suit.

On cross-examination, Anderson admitted that she had given the defendant permission to discipline D.J. by whipping him, but that she and the defendant had devised the alternative punishment of "bouncing." She further admitted that on the morning of D.J.'s death, she too had hit him. However, she testified that, excluding Sunday morning, she had not whipped D.J. in the last two weeks. She also admitted that she had a five thousand dollar ($5,000) life insurance policy on D.J. and that she had filed a claim. The claim had not yet been paid because of the present proceeding.

Anderson also informed the jury that she was being held at the Madison County Penal Farm as a material witness in this case. She testified that her failure to cooperate with authorities in Utah was the reason for her present incarceration.

Dr. Karen Hansen, a physician on the faculty of University of Utah and a member of the Child Protection Team at Primary Children's Medical Center in Salt Lake City, testified about the nature of D.J.'s injuries when he was hospitalized in August 1992. She testified that D.J. had had bruising to his right temple, right eyelid, and right ear lobe. He also had bruises on his abdomen and on his left elbow. Burn marks were detected on D.J.'s left buttock and lower left leg. He also had blistering burn marks on his shoulder, right buttock, and right heel. As a result of these injuries, an extensive skin graft was performed, and D.J. remained hospitalized for over a month.

Dr. Hansen testified that in her opinion the bruises and burns on D.J. had been clearly abusive. She testified that the bruises had been patterned and that there is no other way to get the patterned marks other than through inflicted injury. She also testified that earlobe bruises are classic examples of child abuse. Dr. Hansen further testified that the burns on D.J. were consistent with an immersion type of scalding injury.

Michael B. Morgan, director of training at Jackson Fire Department and a part-time paramedic with Medical Center EMS, testified that he and his partner were the first to respond to Anderson's call to 911. Morgan testified that when he had arrived, he found the defendant trying to perform CPR on D.J. He further testified that D.J.'s body had been very cold and that there had been obvious signs of rigor mortis. Will Helms and Joe House, Jackson Police Department officers, gave similar testimony about the condition of D.J.'s body.

Dr. Thomas K. Ballard, county medical examiner and coroner for Madison County, also testified about the condition of D.J.'s body. He testified that D.J. had had a bruise around his left eye, old burn scars on the back of his left foot, left ankle and lower left leg, fractures around his neck, small scratches on his face, an earlier scar on his right forehead, skin grafts on his left buttock and lower left back area, bruises on his buttocks, and a number of abrasions on his buttocks, arms, and legs. He opined that D.J. had died at least three hours before he examined him at 7:30 p.m.

Dr. O'Brien Cleary Smith, a forensic pathologist, performed an autopsy on D.J. at Dr. Ballard's request. Dr. Smith testified that D.J.'s death had been a result of blunt force injuries. He testified that multiple blows had caused internal bleeding which eventually led to death. During the autopsy, Dr. Smith divided D.J.'s injures into categories according to the probable time the injury was received. In the category of months to years, Dr. Smith noted scars with characteristics of a healing or healed burn. He also noted fine line-like scars which were characteristic of being switched or whipped with a branch or piece of wire. In the category of days to weeks, Dr. Smith noted skin abrasions on D.J.'s right thigh. In the six to twenty-four hour category, Dr. Smith detected a bruise to the buttock area, an abrasion to the right neck, a bruise to the right hand, bruises on the right arm, three bruises to the head, a bruise above the left ear, and a bruise on the scalp. In the category of zero to two hours, Dr. Smith found two abrasions to the right neck, a bruise on the left forearm, and a bruise on the front right thigh.

Dr. Smith testified that D.J. had suffered multiple blows to the buttock area and as a result had bled to death. He testified that a number of small blood vessels had been broken by the blunt trauma. He testified that the bleeding had begun in the buttock region and that the bleeding had been so extensive that the blood made its way to the front of the body to show itself at the skin surface of the groin. Dr. Smith further testified that D.J. had likely lived somewhere between two and six hours before bleeding to death. He testified that the injuries would have been very painful to D.J. and would have caused him to want to stay very still. Dr. Smith testified that most likely D.J.'s heart began to race and his breathing began to hasten. Then, his heart slowed and he became cold and clammy or he may have been shivering in a cold sweat. Eventually, he began to lose consciousness and slipped into shock before dying. Dr. Smith testified that had D.J. received medical attention, he could have survived.

Dr. Smith also testified that some of D.J.'s injuries had had the characteristics of a defensive wound. He testified that the multiple circular bruises across the back of D.J.'s left forearm and bruises on the right wrist and arm had been most likely defensive wounds, but that he could not say for certain that there was not another explanation for those injuries.

Dr. Smith further testified that D.J.'s most extensive injuries were to his lower back and buttocks region. He testified that the injuries could have been inflicted in a span of five minutes or over an extended period of time. Dr. Smith testified that of the several hundred autopsies he had performed concerning blunt trauma type injuries, D.J.'s injuries were the most severe injuries he had seen of this type. He further testified that these injuries had not been inflicted by accidental means.

Doris Jackson, an investigator with the Jackson Police Department, was next to testify. Jackson testified that she had gone to the house the day after D.J.'s death and had spoken to Anderson, D.J.'s mother. While at the house, Jackson retrieved D.J.'s black turtleneck, his underwear, and some socks. She testified that she had found the clothes in the dirty laundry basket and that all the clothes had been wet as if they had been washed and squeezed out. She further testified that she had observed a mucous type substance on the black shirt. These items were sent to the crime lab but nothing of evidentiary value was found. D.J.'s pants, which were found at the foot of his bed, were not sent to the crime lab.

Jackson also testified that on this same day she spoke to the defendant, read him his *Miranda* rights, and had him sign a rights waiver. Jackson then read to the jury the statement given to her by the defendant. At the close of her testimony, the State rested.

The defendant called Sam Phelps, Jr., as his first witness. Phelps testified that he and the defendant had known each other for nearly fifteen years. He further testified that on November 20, 1994, the day of D.J.'s death, he had telephoned the defendant at home. He testified that he had called around eleven or twelve o'clock that morning and that he did not hear anyone in the background. He further testified that the defendant did not act out of the ordinary.

Robert Williams, who had given the defendant janitorial work over the last three or four months, also testified that he had spoken to the defendant on that Sunday. Williams testified that he had telephoned the defendant around one o'clock to see if he could work. He testified that the defendant had said he was babysitting and could not work. Williams further testified that he did not hear anything in the background and that the defendant did not sound agitated.

A third witness, Sam L. Reeves, Jr., also testified that he had telephoned the defendant on that Sunday. He testified that he had called around 1:30 p.m. in order to talk about the football game. He testified that he had talked to the defendant for about an hour and that the defendant had not sounded upset or in any way unusual.

The defendant took the stand in his own defense. He testified that he had treated D.J. as if he were his natural son. He stated that they had played together, had gone to

events, and in general, had had a good relationship. He testified that he had spanked D.J. one time with a belt, but that he mainly used his hand. He further testified that Anderson had not objected to his spanking D.J.

As to the incident in August of 1992, the defendant testified that D.J. had had little bumps on him that the defendant and Anderson discovered after Anderson had given D.J. a bath. He further testified that when these bumps turned into blisters and began to look much worse, he convinced Anderson to take D.J. to the hospital. He testified that he had not caused the injuries and that he did not know how they were caused.

As to the week preceding D.J.'s death, the defendant testified that Anderson had spanked D.J. for ten to fifteen minutes because of the note D.J. brought home from his teacher. The defendant testified that he no longer spanked D.J., but instead used an alternative method of punishment such as "bouncing" or standing in the corner.

The defendant testified that on the following Sunday morning, Anderson had been fussing at D.J. for being too slow to get ready for church. The defendant testified that he had told D.J. to start bouncing. He further testified that while D.J. had been bouncing, he hit his head on the bed rail, but that D.J. had said he was unhurt. The defendant testified that D.J. had bounced for ten to fifteen minutes and then had stopped. Anderson left to go to church shortly thereafter around 11:15 a.m. The defendant testified that he and D.J. then watched television in the defendant's bedroom. He testified that around 1:30 p.m. he had fixed lunch for D.J. Then at about 3:00 p.m., D.J. left the defendant's bedroom and went to his own room because he was sleepy. The defendant testified that he too then fell asleep and did not awaken until around 5:20 p.m. when the telephone began to ring. He further testified that he had remained in his bedroom and did not check on D.J. He stated that he had been in his bedroom when Anderson came home around 6:15 p.m.

He testified that after D.J. left his bedroom he had not heard any sounds from D.J.'s room. He further testified that D.J. had appeared to be fine the whole day. He testified that he had not struck or hit D.J. that day and that he had not caused the boy's injuries. However, he could not explain how D.J. had received the numerous injuries that ultimately caused his death.

State v. Lacy, 983 S.W.2d 686, 687-91 (Tenn. Crim. App. 1997), perm. appeal denied, (Tenn. Sept. 21, 1998).

## Analysis

The petitioner asserts that the post-conviction court erred in denying him post conviction relief. Specifically, he claims that he received ineffective assistance of counsel because trial counsel

failed to obtain a 911 tape from the incident, inadequately prepared for trial, and failed to present potentially exculpatory evidence.

Post-conviction petitioners bear the burden of proving their allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). On appeal, the appellate court accords the trial court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). When a defendant claims constitutionally ineffective assistance of counsel, the standard applied by the courts of Tennessee is "whether the advice given or the service rendered by the attorney is within the range of competence demanded by attorneys on criminal cases." Summerlin v. State, 607 S.W.2d 495, 496 (Tenn. Crim. App. 1980).

In Strickland v. Washington, the United States Supreme Court outlined the requirements necessary to demonstrate a violation of the Sixth Amendment right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). First, the defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and must demonstrate that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Constitution. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Second, the petitioner must show that counsel's performance prejudiced him and that errors were so serious as to deprive the petitioner of a fair trial, calling into question the reliability of the outcome. Id.; Henley, 960 S.W.2d at 579.

"When addressing an attorney's performance it is not our function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley, 960 S.W.2d at 579 (quoting Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). Rather, a court reviewing counsel's performance should "eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from the perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Id.

To establish prejudice, a party claiming ineffective assistance of counsel must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id.; Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

In reviewing a claim of ineffective assistance of counsel, an appellate court need not address both prongs of Strickland if it determines that the petitioner has failed to carry his burden with respect to either prong. Henley, 960 S.W.2d at 580. When the claim is predicated upon counsel's failure to present potential witnesses, their testimony should be offered at the post-conviction hearing. In this manner the court can consider (1) whether a material witness existed and could have been discovered but for counsel's neglect, or a known witness was not interviewed by counsel; and (2) whether the failure to discover or interview a witness prejudiced the petitioner or the failure to call certain witnesses denied critical evidence to the prejudice of the petitioner. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

First, we address the petitioner's claim that his trial counsel was ineffective for not obtaining a copy of the 911 tape of the incident. At the post-conviction hearing, both of petitioner's trial attorneys testified about the 911 tape. According to their testimony, they attempted to obtain a copy of the tape in preparing for the trial. They testified that they were unable to obtain the tape because the tape had either been erased or destroyed. Additionally, the testimony indicated, as did the trial transcript, that the substance of that call was addressed at trial. The post-conviction court concluded that trial counsel was not ineffective for not obtaining the tape. Furthermore, given the fact that the substance of the tape was addressed at trial, the petitioner has failed to show how he was prejudiced by the unavailability of such tape. Accordingly, the evidence does not preponderate against the post-conviction court's findings of counsel's effectiveness regarding the 911 tape.

Next, we address the petitioner's claim that trial counsel was also ineffective for not properly investigating and introducing potentially exculpatory evidence in support of his defense. Although the petitioner alleges several incidences of not properly preparing a defense, the crux of this claim is three-fold: (1) that trial counsel did not meet with the petitioner an adequate number of times in preparation of a defense; (2) that trial counsel failed to introduce the results of fingernail scrapings taken from the defendant; and (3) that trial counsel failed to adequately interview one of the State's witnesses and failed, at trial, to properly develop her as a suspect in the crime.

At the post conviction hearing, both of the petitioner's trial attorneys testified that they met with the petitioner several times, including at least three visits to the various facilities where he was incarcerated. Also, trial counsel met with the petitioner several times before and after some of the hearings before trial. Additionally, trial counsel communicated with the petitioner several times via telephone and mail in preparation for his trial. The post-conviction court concluded that trial counsel was not ineffective in preparing a defense for the petitioner. The record clearly supports those findings.

The petitioner's claim that his counsel was ineffective for failing to pursue the lab results of his fingernail scrapings taken during the investigation is based on his assertion that this evidence was exculpatory and could have been used to show his innocence. However, at the post-conviction hearing, the petitioner failed to introduce the results of such samples nor how he could have used them to prove his innocence. The post-conviction court found that the petitioner failed to show how

he was prejudiced by his counsel failing to introduce such evidence. The record supports the post-conviction court's findings.

Finally, the petitioner claims that his counsel was ineffective for failing to adequately interview the victim's mother, one of the State's key witnesses. The petitioner also asserts that by failing to adequately pursue the victim's mother's background and develop her as the perpetrator of the crime, trial counsel was ineffective and should have requested a psychological evaluation of her to attack her credibility at trial. Trial counsel testified that he did in fact meet with the victim's mother and she refused to speak to him about the events surrounding this crime. Although trial counsel made all reasonable efforts to speak with her, this witness was clearly under no obligation to speak to trial counsel. Trial counsel testified that they did not pursue a psychological evaluation of the victim's mother because they felt like that was an approach that might damage their case. In essence, trial counsel was without the necessary evidence to attack the victim's mother's mental stability and made a strategic decision in presenting the defendant's case. This court will not second guess trial counsel's strategic decisions in presenting a defense. See, e.g., Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). We agree with the post-conviction court's finding that this was not ineffective assistance of counsel.

## Conclusion

After reviewing the entire record before us and the post-conviction court's findings, we hold that the petitioner has failed to show that the record preponderates against the trial court's finding that the petitioner received effective assistance of counsel. We affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-10-