IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. ROBERT L. EVANS, JR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 99-05329-30     Joseph B. Dailey, Judge**

_____

**No. W2002-02744-CCA-R3-CD  - Filed October 29, 2004**

_____

The defendant, Robert L. Evans, Jr., was indicted for aggravated robbery, first degree premeditated murder, and first degree felony murder.  A jury convicted the defendant on all counts.  The two murder convictions were merged, and the jury imposed life without parole.  The trial judge sentenced the defendant to life without parole plus twelve years for aggravated robbery.  The twelve-year sentence was ordered served consecutively to the murder sentence and a previous sentence of death in Illinois.  The defendant now appeals his convictions and the consecutive sentencing.  We affirm both the convictions and sentencing.

**Tenn. R. App. P. 3. Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Coleman W. Garrett and James Turner, Memphis, Tennessee, for the appellant, Robert L. Evans, Jr.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jerry Kitchen and Michelle Kimbril-Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Robert L. Evans, Jr., was convicted by a jury of all charges contained in two separate indictments.  The first indictment charged aggravated robbery.  The second indictment contained two counts: first degree premeditated murder and first degree felony murder.  All charges arose from a robbery of the Germantown McDonald's restaurant in the early morning hours of November 5, 1997.  During the robbery, Delma Ramsey, an assistant manager, was brutally beaten and eventually died from her injuries.  The two murder convictions were merged.  In the penalty phase, the jury sentenced the defendant to life without possibility of parole.  Subsequently, after a sentencing hearing, the trial court imposed a sentence of twelve years for aggravated robbery to be

served consecutive to the defendant's life sentence and a death sentence previously imposed in Illinois.

The defendant now appeals the conviction and sentencing and presents three issues for our review:

    (1)  whether the evidence was sufficient to support the convictions for first degree murder;

    (2) whether certain photographs' prejudicial effect outweighed their probative value; and,

    (3) whether the trial court erred in imposing consecutive sentences.

## Factual Background

Delma Ramsey was an associate manager at McDonald's in Germantown. According to her husband, Dennis Ramsey, she was forty-nine years old and had been employed at this same restaurant for approximately twenty years. She was responsible for opening the restaurant and left home on those mornings between 2:00 to 2:30 a.m., arriving at the restaurant from 2:30 to 3:00 a.m.

Larry Graves was a market security manager for McDonald's. His duties included reviewing sales figures on the stores in his jurisdiction and serving as a liaison to law enforcement. His records indicated that the victim had deactivated the security alarm at the restaurant at approximately 2:20 a.m. on November 5, 1997. There were no security cameras installed at this restaurant at that time. Mr. Graves received notice of an incident at the Germantown McDonald's and went to the scene at 5:00 a.m. on November 5th. He did an audit of the cash and determined that $1200.00 was missing. The safe in the restaurant office was open and four cash tills were lying on the floor. He described the office as very small, approximately six feet wide.

Winford Howe, an area supervisor for McDonald's security, testified that he had once been the manager at Germantown McDonald's. He had known Delma Ramsey as an employee. He stated that only management knew the restaurant's safe combination, and it was Ramsey's responsibility to open the safe each morning. Mr. Howe had known the defendant when he was employed at McDonald's. He stated that the defendant was originally hired in June of 1996, and his last paycheck was October 14, 1997. Mr. Howe also knew another employee at the restaurant, Ms. Emma Owens, the defendant's grandmother.

Mr. Kareem Colliar, in November of 1997, was the second assistant manager at Germantown McDonald's. He had closed the business on the night of November 4th and explained closing procedures. The procedures included the counting of all money in the cash tills and placing the money and tills in the office safe. When closing, employees exited the building via the south door facing First Tennessee Bank. Employees entering the closed business always entered by the south door.

Mrs. Emma Owens was a server at the business and had been employed there since 1992. She was also the grandmother of the defendant and Maurice Lane, the co-defendant. Mrs. Owens had developed a close relationship with Delma Ramsey and worked the same shift. It was their

custom for Mrs. Ramsey to call Mrs. Owens at 3:00 a.m. each work day and Mrs. Owens reported at 4:00 a.m. She received her wake up call on November 5, 1997. Later she received another call at home but only heard choking sounds and hung up the phone without checking her caller identification. When she arrived at work, she and another employee knocked on the door for entrance but it was unacknowledged. After five or ten minutes, she went to a phone and called the police.

Mrs. Owens stated that the defendant and Maurice Lane had been employed at the restaurant on two different periods. She said the victim had a good relationship with the defendant and Lane and called them her brothers. After the defendant's arrest, Mrs. Owens talked to him by telephone. She asked him if she had been present would he have "had to kill her too." The defendant said, "no grandmamma."

Douglas Powell was also an employee on the 4:00 a.m. shift on November 5, 1997. He testified that upon his arrival, Mrs. Ramsey's car was parked on the south side of the building. Both he and Mrs. Owens knocked repeatedly on the door but received no response. He said Mrs. Owens left to call the police.

Ben Zachary Rogers was a police officer with the Germantown Police Department in November of 1997. He and his partner, Kevin Santonio, responded to the call Mrs. Owens had made. By peering through a drive-in window on the north side of McDonald's, Rogers could see Mrs. Ramsey's prone and apparently unconscious body on the floor. He then requested an ambulance through dispatch. Two other Germantown officers, Cannon and Fisher, arrived. Cannon discovered that the north door was unlocked, and the officers went inside. Rogers stated that Mrs. Ramsey was unconscious but her small gurgling sounds of breathing were audible.

Lt. Bruce Connor of the Germantown Police Department also responded to the scene along with his partner, Matt Fisher. Lt. Cannon stated he had known the victim but, due to the extent of her injuries, he did not recognize her. When the paramedics arrived, one pointed out that an apron was tied as a ligature around the victim's neck. Lt. Cannon photographed the crime scene, including the open safe in the office. He also stated that he found a set of keys in a grassy area between McDonald's and Captain D's Restaurant.

At the time of the offenses, Ted Friend was an EMS lieutenant for the Germantown Fire Department. He arrived at the scene and found the victim in critical condition. There was no discernible blood pressure, he could not detect oxygen in her blood. He described the apron on the victim's neck and its restriction of blood flow. Her face was discolored to the degree that Lt. Friend mistook her to be a black person. The victim was sent to Methodist Hospital in Germantown, where she eventually died.

Julia Haden served as bank manger of First Tennessee Bank in Germantown at the time of this offense. She said the bank maintained a video camera on the ATM machine and that the camera

points toward the adjacent McDonald's. Ms. Haden had turned over the video tapes of November 4 and 5, 1997, to the Germantown Police upon their request.

Tom Edwards was accepted as an expert witness in the field of forensic video enhancement. He described his expertise as taking bad pictures and making them "bigger, better and brighter." Dr. Edwards' business had taken the video furnished by First Tennessee Bank and focused on approximately 3000 images of scenes portraying the McDonald's area. At 2:22 a.m., the camera caught what appeared to be car lights that circled McDonald's and then parked in the restaurant lot. There were several indications of motion from within the restaurant from 2:24 to 2:28 a.m. No more motion was detected until approximately 4:01 a.m. and after that, an abundance of motion was evident. He explained that this type of camera was the worst kind for clear resolution. The camera was intended for close range observation, was seldom cleaned, and the tapes suffered from overuse.

Ferlandis Scott is a cousin of the defendant's who was, at the time of trial, in penal custody in Decatur, Illinois. Mr. Scott had lived in Memphis with the defendant's family for three months in 1997. Along with the defendant, he worked at the Germantown McDonald's during that time. On one occasion Scott told the defendant that it would be easy for them to rob the restaurant due to their knowledge of the business. Upon further reflection, Scott said he abandoned the idea due to the unlikelihood of succeeding without being recognized. He then moved back to Decatur. In May of 1999, both Mr. Scott and the defendant were inmates at the Macon County, Illinois, jail in adjoining cells. Scott asked the defendant about the events at the Germantown McDonald's, and the two had several conversations. Scott stated that the defendant said Maurice Lane had gone with him to the restaurant and waited in the car two blocks away. The defendant knocked on the door and was admitted by Delma Ramsey. The defendant was wearing gloves. Mrs. Ramsey called Mrs. Emma Owens, the defendant's grandmother, and the defendant motioned to Mrs. Ramsey not to mention his presence. The defendant told him that he beat and choked the victim. When Mrs. Ramsey regained consciousness, the defendant elbowed her and knocked her out again. The defendant said he took $1000.00. Scott then told his mother, Marilyn Evans, what the defendant had revealed. Scott was questioned by police officers, and he gave them the same information. After the police had talked to the defendant in May of 1999, the defendant requested for Scott to tell the police that Maurice Lane had beaten Mrs. Ramsey. The defendant then sent requests for a Decatur officer to question Scott.

Frank Campbell served as an investigator for the Macon County State Attorney Office in Decatur, Illinois. Mr. Campbell testified that Ferlandis Scott received no concessions on his Illinois sentence for his testimony in this case.

Maurice Lane, the co-defendant and a cousin to the defendant, testified to the events on November 5, 1997. Lane said that the defendant came to Lane's home about 12:30 a.m. on November 5, 1997, and proposed they rob the Germantown McDonald's. The defendant said he had already been there and "scoped the scene out." The two men drove to the McDonald's and parked in the rear. The defendant put on a McDonald's shirt and a black "hoodie." The defendant then went to the door of the restaurant that faced First Tennessee Bank while Lane remained in the

vehicle. Mrs. Ramsey admitted the defendant when he knocked on the window. The defendant exited by the north door on the opposite side of the building. Lane said that the defendant was running and made a throwing motion on his way to the vehicle. The defendant's shirt was "full of blood," and Lane noticed blood and skin under the defendant's fingernails. The defendant said "[w]e just scuffled a little bit." Later that evening, the defendant counted the money taken, and it totaled $1200.00, according to Lane. Later that morning, the defendant and Lane drove to Decatur, Illinois. The defendant gave Lane $35.00 or $40.00 of the stolen money. After arriving in Decatur, the defendant admitted to Lane that he had beaten and choked Delma Ramsey and thought he had killed her. Lane learned of Mrs. Ramsey's death a few days later.

When Lane was first questioned by police concerning the instant offense, he denied his involvement and told them the defendant's father was involved. Lane later gave yet a different version of the events. On cross-examination, Lane freely admitted to his earlier false statements but maintained that he was now testifying truthfully.

Dianne Thackery, Maurice Lane's attorney, testified that the only promise made by the State to Lane in this case was that consideration would be given if Lane testified truthfully.

Samuel Jason Walker was a detective investigator with the Decatur, Illinois, Police Department. Detective Walker stated that he received three written requests by the defendant to speak with him. Detective Walker met with the defendant on May 27, 1999, in the Macon County Jail, and the defendant asked Walker to speak to Ferlandis Scott.

Detective James Bruce with the Germantown Police, was assigned to the investigation of the instant offenses. On November 6th, he examined the caller identification device on Emma Owens' home telephone. It showed a call received at 3:12 a.m., November 5th, from the Germantown McDonald's. He explained that if two calls were received from the same number, only the last one received would be shown.

Detective Bruce first interviewed the defendant on May 25, 1999, while the defendant was confined in Decatur. The interview was recorded on video tape. In this interview, the defendant said that he and Lane went by the Germantown McDonald's on November 5th. Mrs. Ramsey would not admit the defendant to enter but did allow Lane entry. The defendant waited in the car, and Lane came out twenty to thirty minutes later with a bag in his hand. Lane did not mention beating the victim until later. They returned to the defendant's home where Lane counted the money he had taken. Lane gave the defendant $500.00. Later that morning, Emma Owens called the defendant's mother and related the events at McDonald's. The defendant paid his father $100.00 to take him to Decatur. Lane accompanied them. They returned to Memphis after a few days. Lane reluctantly admitted to the defendant that he had beaten Mrs. Ramsey. The defendant said he was giving this statement because Lane had blamed him in Lane's statement to the officers.

On June 3, 1999, Detective Bruce conducted another videotaped interview with the defendant. After being informed of the statements made by Maurice Lane and Ferlandis Scott, the

defendant gave a different version of the event under investigation. In this version, the defendant stated that the idea to rob McDonald's was Lane's. In this version, the defendant said he accompanied Lane into the restaurant. Lane called to the defendant from the office, and the defendant responded. The defendant said Lane had Mrs. Ramsey in the floor of the office. The defendant emptied the cash drawers in the safe while Lane dealt with Mrs. Ramsey. The defendant said he saw blood and heard gurgling noises but did not see what Lane was doing to the victim. The two men drove to the defendant's home and counted the money taken. The defendant estimated it as $1200.00 or $1300.00 and said they split it. The defendant claimed that after the men went to Decatur, he spent some of the money buying things for his daughter.

Dr. O. C. Smith was qualified as an expert in the field of forensic pathology. He testified that he was present at the crime scene investigation on November 5th and performed an autopsy on Mrs. Ramsey on November 6th. Dr. Smith concluded that the victim died of multiple injuries. He observed abrasions and skin scrapes to the face and both sides of the head. Her lips were bruised. Marks on her neck were consistent with ligature strangulation. The victim had a depressed skull fracture above the right ear. In addition to the ligature marks on the neck, strangulation was also indicated by petechial hemorrhages in the skin and eye of the victim. An almost two-inch diameter circular injury was present on the back of the head. The left ear had skin torn away from the underlying cartilage. Multiple bruises appeared on the victim's chest, top left shoulder, back shoulder blades, and deep bruising of the left hip.

During the autopsy phase, Dr. Smith found "fairly extensive injuries internally in the area of the head/neck region." In addition to the skull fracture on the right side of the victim's head, a hinge fracture (complete separation of the skull) was noticed at the base of the skull. There was bleeding about the brain resulting from the blunt forces, as well as bruising of the brain. The hyoid bone, a wing-like bone between the jawbone and Adam's apple, was fractured. Dr. Smith explained that severe force was necessary to cause a hinge fracture of the skull but lesser force if the head was on a firm surface such as a floor, when the force was administered.

Steven H. Symes, a forensic anthropologist at Shelby County Medical Examiner's Office, was qualified as an expert in his field. He testified that the victim had two major areas of the skull that suffered fractures due to blunt trauma. Both nasal bones were fractured, and bilateral fractures ran up the side of the face. These resulted from a broad blunt forced impact, he said. An area high on the skull suffered fractures. A hinge fracture was present at the base of the skull. He stated that hinge fractures often result from entrapment, the head being hit with force while against a solid object.

After the State rested its case, the defendant testified. The defendant related that he had last worked at the Germantown McDonald's in September of 1997. He described Delma Ramsey as being helpful to him at work and said "[s]he treated me like a son." The defendant said Ferlandis Scott first suggested robbing McDonald's in the spring of 1997. The defendant said that he did not have any other conversations concerning such a plan. He denied being at the McDonald's on November 5, 1997, and denied any complicity in the offenses. The defendant said he had been

planning the trip to Decatur for a week due to his two-year-old daughter's request. Maurice Lane went with them to Decatur on the morning of these offenses. The defendant explained that his first statement made to Detective Bruce was due to Maurice Lane having placed blame on the defendant. The second revised statement was due to being told by Germantown officers that if he did not improve his story, he would be sentenced to death. The defendant stated that Ferlandis Scott's testimony was a fabrication. The defendant insisted that he had no involvement in these offenses and received no money from the robbery proceeds.

## First Degree Murder

The defendant asserts that the evidence is insufficient to support first degree premeditated murder. As we have previously observed, the defendant was convicted of both first degree premeditated murder and first degree felony murder. Both crimes constitute first degree murder, see Tenn. Code Ann. § 39-13-202(a)(1), (2); State v. Hurley, 876 S.W.2d 57, 58 (Tenn. 1993). It has been recognized repeatedly by our appellate courts that "the perpetration of a felony, during which a homicide occurs, is the legal equivalent of premeditation, deliberation and malice." Strouth v. State, 999 S.W.2d 759, 768 (Tenn. 1999) (Holder, J. concurring) (citing State v. Beasley, 699 S.W.2d 565 (Tenn. Crim. App. 1985)); see also Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (Tenn. 1956). When there is one victim and the jury returns guilty verdicts under both theories of first degree premeditated murder and first degree felony murder, the trial court should accept both verdicts but enter only one judgment by merging the two verdicts. See Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997); State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). The defendant has not challenged the sufficiency of the evidence supporting the first degree felony murder conviction. Therefore, it is questionable that the defendant could avail himself of relief by achieving success on this appellate issue. Nevertheless, our review of the record indicates that there was sufficient evidence to support the jury's conviction of first degree premeditated murder.

When sufficiency of the evidence is challenged on appeal by the accused, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). We accept the jury's resolution of questions concerning witness credibility. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant contends that the State failed to prove that the killing of Delma Ramsey was premeditated. The relevant definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). 'Premeditation' means that the intent to kill must have been formed prior to the act itself. Tenn. Code Ann. § 39-13-202(d) (2002). The element of premeditation is a question of fact to be determined by the jury that may be established by proof of the circumstances surrounding the killing. State v. Suttles, 30 S.W.3d 252, 261 (Tenn.

-7-

2000). There have been delineated several non-exclusive factors that tend to support premeditation and deliberation, including: declarations by the defendant of an intent to kill the victim, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of murder, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

Applying these factors to the instant facts, three appear as most compelling: the brutality and cruelty of the killing, infliction of multiple injuries, and apparent calmness afterwards. In addition, the defendant had abundant motive in that he was known by Delma Ramsey and could only escape arrest by silencing her permanently. Viewing the evidence and inferences therefrom in a light most favorable to the State, we find sufficient evidence to support the jury's finding of premeditation. The testimony of Drs. Smith and Symes provided graphic evidence of the extent of the beating and choking inflicted upon the victim. The victim suffered injuries to her chest, shoulder, head, and neck, with the most damaging being the multiple skull fractures and strangulation. Immediately afterwards, the defendant returned home, calmly counted his proceeds, and soon thereafter arranged for his trip to Illinois.

**Autopsy Photographs**

The defendant, in his second issue, alleges error in the admission of autopsy photographs as evidence. The State has not raised the issue, but our review of the record indicates that this issue was not presented in the defendant's motion for a new trial. The original motion for new trial was filed July 25, 2002, without reference to any photographic evidence admitted in trial. Although the motion reserved the right to amend or add grounds, there is no indication in the appellate record of such amendment or addition. Neither is the transcript of the new trial motion argument a part of the appellate record. Failure to include this issue in the motion for new trial constitutes waiver. Tenn. R. App. P. 3 (e); see State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). Nevertheless, we will consider the issue on its merits.

The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, the photograph must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

We, therefore, must first determine whether the photographs were relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

The trial court conducted a jury-out hearing to examine the photographs proposed as exhibits to Dr. Smith's testimony. As a result, a number of photographs were excluded by the trial judge. Pertaining to those admitted, the trial judge observed:

> I think the probative value far outweighs the prejudicial effect. While of course, as we discussed earlier, they're in color and they're not pleasant, they do accurately and in great detail set out, for the jury, which injuries were inflicted and the nature and the types of injuries; so I'll allow these in.

We have inspected the subject photographs and agree with the trial judge that their probative value outweighed any undue prejudicial effect. With one exception, all photographs of the victim were without any autopsy incisions and portrayed the external evidence of the victim's injuries. Accordingly, we find no abuse of discretion in the trial judge's admission of the autopsy photographs.

## Consecutive Sentencing

In his last issue, the defendant contends that the trial court erred in imposing consecutive sentences for first degree murder and aggravated robbery. A defendant who challenges his or her sentence has the burden of proving the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). It is this Court's duty to conduct a *de novo* review of the record with a presumption the trial court's determinations are correct when a defendant appeals the length, range, or manner of service of his or her sentence. Tenn. Code Ann. § 40-35-401(d) (1989). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999).

The trial court found the defendant to be a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, pursuant to Tennessee Code Annotated section 40-35-115(b)(4). This statute may be applied when a defendant has been convicted of more than one offense, whether the multiple offenses arise out of the same proceeding or multiple proceedings. State v. Moore, 942 S.W.2d 570, 572 (Tenn. Crim. App. 1996).

However, application of the "dangerous offender" status, in and by itself, is insufficient to justify consecutive sentencing. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). There must be particular facts which show that consecutive sentencing is reasonably related to the severity of the offenses and serves to protect society from further aggravated criminal conduct. Wilkerson, 905 S.W.2d at 939.

During sentencing in this cause, the trial court stated:

> But clearly the overriding consideration in this sentencing hearing today, both as to the number of years he receives and as to whether it should be served concurrently

or consecutively has to be the -- just the unbelievable -- unbelievably savage and brutal nature of this crime that was committed by this man and his total and complete lack of remorse that has been exhibited throughout these entire proceedings -- just an unimaginable crime -- beating inflicted on the victim of this case during the course of the robbery and the subsequent murder.

And all one has to do is read the record in this case to understand that this man is obviously, and by any definition known to man, a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. He fits that definition more certainly than anyone I have ever seen in my entire life. So, he will receive a twelve-year sentence to be served consecutive to his life-without-parole sentence and consecutive to any sentence he has in any other jurisdiction.

We conclude that the trial judge, in imposing consecutive sentences, was in conformance with the requirements of Tennessee Code Annotated section 40-35-115(b)(4) and the dictates of Wilkerson. Accordingly, we affirm the sentences as imposed.

### Conclusion

Having reviewed the entire record in this cause, for the foregoing reasons, we affirm the judgments of conviction and the sentences imposed.

_____
JOHN EVERETT WILLIAMS, JUDGE