# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 26, 2013

## STATE OF TENNESSEE v. SHAWN ANTHONY JONES

**Direct Appeal from the Criminal Court for Greene County**
**No. 09CR398    John F. Dugger, Jr., Judge**

**No. E2012-00480-CCA-R3-CD-FILED-AUGUST 9, 2013**

A Green County Criminal Court Jury convicted the appellant, Shawn Anthony Jones, of one count of first degree premeditated murder, three counts of first degree felony murder, and one count of attempted first degree premeditated murder. The trial court merged the murder convictions and sentenced the appellant to life. After a sentencing hearing, the trial court sentenced the appellant to twenty-five years for the attempted murder conviction and ordered that he serve the sentence consecutively to the life sentence. On appeal, the appellant contends that the trial court erred by (1) allowing the State to introduce into evidence unduly prejudicial photographs of the victims, (2) failing to suppress his statements to police, (3) refusing to allow him to show that a co-defendant told police she kicked open the door to the victims' home, and (4) failing to grant his motion for a mistrial when the prosecutor commented on his failure to testify. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

T. Wood Smith, Greeneville, Tennessee, for the appellant, Shawn Anthony Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Cecil C. Mills, Jr., and Ritchie Dale Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In November 2010, the Greene County Grand Jury indicted the appellant for first degree premeditated murder, first degree felony murder committed in the perpetration of robbery, first degree felony murder committed in the perpetration of burglary, and first degree felony murder committed in the perpetration of theft for the death of Jimmy Lee Cutshall. The grand jury also indicted the appellant for attempted first degree premeditated murder for injuries sustained by Mr. Cutshall's wife, Rhonda Cutshall.

The appellant does not contest the sufficiency of the evidence. Taken in the light most favorable to the State, the evidence at trial shows that on the evening of October 12, 2009, the appellant and his girlfriend, Jessica Myers, went to the Cutshall home to buy Xanax. While they were there, Mrs. Cutshall argued with Myers and accused Myers of stealing her prescription pills. Mrs. Cutshall found a bottle of her pills in the appellant's Jeep, and the Cutshalls ordered the appellant and Myers to leave. The appellant replied, "We'll be back." In the early morning hours of October 13, 2009, Mr. Cutshall was lying on the couch in the living room while Mrs. Cutshall was asleep in the back bedroom of their single-wide mobile home. Chastity Renner, the girlfriend of Jimmy Cutshall's son, was sleeping in the back bedroom with Mrs. Cutshall. About 5:00 a.m., Renner received a telephone call from Mr. Cutshall's son and went into the bathroom to talk with him so that she would not disturb anyone. As soon as Renner shut the bathroom door, she heard "a big boom" and Jimmy Cutshall screaming. A few minutes later, Renner heard Mrs. Cutshall screaming. Renner called 911, hid in the bathroom, and waited for the police.

When officers arrived at the scene, they found Mr. Cutshall lying on the living room floor by the front door. He had been shot multiple times in the face, shoulder, neck, stomach, and right leg and was deceased. Mrs. Cutshall was lying on the floor in the back bedroom. She had been shot in the head but was alive and asked the officers what happened. Numerous .22 caliber spent shell casings were on the floor in the living room and the bedroom. Renner came out of the bathroom and later reported to police that Mrs. Cutshall had argued with the appellant and Myers the previous evening. Based on Renner's information, officers interviewed the appellant on October 13 and 14.

The appellant gave six statements. In his first statement, he claimed that on October 11, 2009, someone named Matthew Blake came to his home and tried to sell him "a rifle with a squirrel on the stock." Mrs. Cutshall and "another girl" were with Blake. The appellant fired the gun but did not buy it and was worried that Blake may have "planted" the rifle inside or outside of the appellant's house. In his second statement, the appellant said that on October 12, 2009, he and Myers went to the Cutshall home, and Mrs. Cutshall accused Myers of stealing Xanax from her. The appellant and Myers bought pills from Mrs. Cutshall but did not argue with her. In the appellant's third statement, he said that about 4:00 a.m. on October 13, 2009, Blake and Myers told him that they were going to Mrs. Cutshall's home

to get pills. They left in the appellant's Jeep and returned about 6:00 a.m. Blake showed the appellant a Florida prescription written to Mrs. Cutshall, and Myers told the appellant that she kicked in the Cutshalls' door. Myers also told the appellant that Blake "led in shooting," that Myers hit Mrs. Cutshall with a tire tool, and that Blake shot Mrs. Cutshall.

In the appellant's fifth statement,[1] he said that about 6:00 p.m. on October 12, he and Myers went to Mrs. Cutshall's house to buy pills. Myers stole a bottle of pills from Mrs. Cutshall, and Mrs. Cutshall found the pills in the appellant's Jeep. Mrs. Cutshall sold pills to the appellant and Myers but told them never to come back. The next morning, the appellant, Myers, and someone named Chad Rader decided to rob the Cutshalls. The appellant dropped off Myers and Rader near the Cutshall home. About forty-five minutes later, Rader telephoned the appellant, and the appellant picked them up. Myers was carrying a pocketbook containing money and pills, and Rader had a gun. Rader told the appellant that he "had to shoot them." The appellant, Myers, and Rader returned to the appellant's house, divided the pills and money, and hid the gun in a closet. Later that day, Myers spoke with Rader on the telephone and told him to "get the gun and do something with it." In the appellant's sixth statement, he said that he, Myers, and Rader went to the Cutshall home to commit a robbery. Rader drove the appellant's Jeep and dropped off the appellant and Myers. The appellant and Myers were wearing masks and gloves, and Myers had a .22 caliber rifle. The appellant kicked open the Cutshalls' front door, Myers shot Mr. Cutshall, and the appellant ran to the back bedroom where Mrs. Cutshall was sleeping. He grabbed her pocketbook, ran, and heard more gunshots. The appellant returned to the Jeep, and Myers got to the Jeep fifteen minutes later. Myers told the appellant that she thought the Cutshalls were dead.

The police searched Rader's property and found a .22 caliber rifle with a squirrel on the stock hanging in a pine tree. Tests revealed that the rifle fired the spent shell casings found in the victims' home. Officers searched the appellant's house and found four boxes of .22 caliber ammunition and a plastic bag containing wet clothes, shoes, gloves, and a mask. Gunshot residue and blood from the victims was on some of the clothing. A search of the appellant's Jeep revealed two toboggan-style masks, a Walmart receipt, and a .22 caliber shell casing. On October 13, 2009, Myers' mother brought a pocketbook to the Greene County Sheriff's Department. Although the pocketbook belonged to Myers, it contained cards, identification, and a Florida prescription belonging to Mrs. Cutshall.

The jury convicted the appellant of all five counts as charged. The trial court merged

---

[1]The appellant's fourth statement was audio-recorded, and the State played the recording for the jury. No witnesses testified about the contents of the recording, and the recording has not been included in the appellate record for our review.

the murder convictions and sentenced the appellant to life. After a sentencing hearing, the trial court sentenced the appellant to twenty-five years for the attempted murder conviction, a Class A felony, and ordered that he serve it consecutively to the life sentence.

## II. Analysis

### A. Photographs

The appellant contends that the trial court erred by allowing the State to introduce into evidence prejudicial photographs of the victims. Specifically, the appellant challenges the admissibility of exhibit 24, showing Mr. Cutshall lying on the living room floor with a gunshot wound beside his right ear; exhibit 25, showing a close-up view of the wound; and exhibit 38, showing Mrs. Cutshall with a bloody face and shirt, lying on her back in the bedroom. The State contends that the trial court properly admitted the photographs. We agree with the State.

Before trial, the appellant filed a motion to suppress numerous photographs, including the photographs at issue. In a pretrial hearing, counsel for the appellant, Myers, and Rader argued that the probative value of the "bloody, gruesome" photographs was outweighed by their prejudicial effect and "would just inflame the passion of the jury." Regarding exhibit 24, the trial court ruled that the photograph was relevant to show the location of Mr. Cutshall's body when the police found him. Regarding exhibit 25, the trial court ruled that the photograph, which included Mr. Cutshall's face, was relevant to show the stippling around his gunshot wound. However, the trial court ordered that the State crop the photograph to leave only the wound and a line of blood running downward from the wound. Regarding exhibit 38, the trial court ruled that the photograph was relevant to show Mrs. Cutshall's injuries. The trial court noted that "[i]t's a murder case. You're going to have some blood" and concluded that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. Thus, the trial court held that the photographs were admissible.

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Relevant evidence is "evidence

having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

We conclude that the trial court did not err by admitting the photographs into evidence. The first photograph shows the upper half of Mr. Chutshall's body. Mr. Cutshall is lying on his stomach on the floor with his face turned toward the camera. A bullet hole is just below his right ear with a line of blood running down his cheek to his mouth. A large amount of blood is underneath his head. We agree with the trial court that the photograph is relevant to show the position and the condition of the victim's body when the police found it. While the photograph shows the gunshot wound and blood underneath the victim's head, the wound is a clearly-defined hole and is not particularly gruesome. The second photograph shows a close-up of the wound in the previous photograph with stippling around the wound. It is relevant to support testimony at trial that the wound was a close-contact wound and also is not particularly gruesome. The third photograph shows the upper half of Mrs. Cutshall lying on her back in the bedroom. Her face is swollen, blood is on her forehead and underneath her nose, and blood is on the upper half of her t-shirt. Her right eye is open. Again, the photograph is relevant to show the victim's injuries and is not particularly gruesome. Therefore, we conclude that the trial court properly ruled that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice and that the appellant is not entitled to relief.

B. Motion to Suppress Statements

Next, the appellant contends that the trial court erred by denying his motion to suppress his statements to police because he was intoxicated from prescription pills when he gave the statements. The State contends that the trial court properly denied the motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress his statements, arguing that he was intoxicated when he gave them and unable to waive his constitutional rights. At the suppression hearing, Detective Sergeant Mike Fincher of the Greene County Sheriff's Department (GCSD) testified that he spoke with the appellant at 8:15 a.m. on October 13, 2009, and gave the appellant Miranda warnings from the sheriff department's standard waiver of rights form. Lieutenant Jim Ellison also was present, and the appellant signed the

form. The detective asked the appellant questions about his name, sex, race, date of birth, address, telephone number, social security number, place of employment, next of kin, and next of kin's telephone number, and the appellant gave a statement. Detective Fincher said the appellant did not seem to be intoxicated, was awake, and was able to answer his questions. Detective Fincher did not make any promises to the appellant in return for his statement and did not threaten him.

On cross-examination, Detective Fincher testified that he did not know the appellant prior to the interview and that he "didn't notice anything really outstanding" about the appellant. The appellant was polite and cooperative but did not show much expression. Detective Fincher did not remember the appellant's telling him that the appellant had consumed narcotics, and Detective Fincher did not ask the appellant about drugs. The interview was not recorded and was brief. At some point, Detective Danny Ricker arrived and took over the interview. Detective Fincher acknowledged that the appellant could have had drugs "in his system" at the time of the interview.

On redirect examination, Detective Fincher testified that the appellant responded to his questions appropriately. The officer did not recall the appellant's having slurred speech.

Detective Danny Ricker of the GCSD testified that the appellant already had received Miranda warnings when he began interviewing the appellant. He said that the appellant "appeared coherent, fine" and that he understood the appellant. About one and one-half hours later, Detective Ricker took the appellant's second statement. Nothing about the appellant had changed since his first interview. Detective Ricker took the appellant's third statement about lunchtime, and the appellant appeared to understand the officer's questions. Detective Ricker interviewed the appellant again about 5:00 p.m. Prior to taking the statement, Detective Ricker read another waiver of rights form to him. Detective John Huffine also was present. The appellant signed the form and did not appear to be intoxicated. The appellant's speech was coherent, and he responded to the officer's questions appropriately. The appellant never refused to answer the officer's questions and gave a two-page written statement. Detective Ricker did not make any promises to the appellant in return for his statement or threaten him.

On cross-examination, Detective Ricker testified that when he began interviewing the appellant on October 13, Detectives Fincher and Ellison were already in the process of interviewing him. The appellant's first interview may have lasted one hour, and Detective Ricker did not recall asking the appellant if he had ingested any drugs within the previous

twenty-four hours. The appellant's second interview with the detective also may have lasted one hour, his third interview lasted one to one and one-half hours, and his fourth interview lasted one to two hours. Defense counsel asked the officer, "And during any of these interviews did you ask him what substances he had ingested in the day or so before the interviews?" Detective Ricker answered, "I know that there was mention of Xanaxes and maybe Oxys but the night before all this happened." Detective Ricker acknowledged that although some of the appellant's statements mentioned buying pills, the statements did not mention consuming pills.

Detective Captain John Huffine of the GCSD testified that at 11:20 a.m. on October 13, the appellant gave consent to search his Jeep and signed a consent to search form. The appellant appeared to understand what he was doing. On cross-examination, Detective Huffine testified that he did not think he told the appellant that he could obtain a search warrant even if the appellant did not sign the consent to search form.

Greene County Sheriff Steve Burns testified that on the morning of October 13, he left the crime scene and drove to a residence where he thought he could find the appellant and Myers. As he approached the home, the appellant's Jeep turned into the driveway. Sheriff Burns followed the Jeep and got out of his vehicle. The appellant was driving the Jeep, and Myers was a passenger. Sheriff Burns asked them to accompany him to the sheriff's department, and the appellant, driving his Jeep, followed Sheriff Burns to the department. Sheriff Burns would not have allowed the appellant to drive if he had thought the appellant was under the influence of drugs or alcohol.

On cross-examination, Sheriff Burns testified that he located the appellant and Myers about 7:00 a.m. He said that he was about eight to ten feet from the appellant, that the appellant and Myers were very cooperative, and that they did not question why he wanted them to follow him to the sheriff's department. He said that the appellant "carried on a very reasonable conversation, no problems at all, no resistance" and that the appellant "was very normal in everything I did see."

The then thirty-three-year-old appellant testified that he completed the eleventh grade and could read and write but not very well. Defense counsel asked if he remembered speaking with Sheriff Burns on October 13, and the appellant said, "Not really, no." He said that during the twenty-four hours before he talked with the police, he consumed eight to ten two-milligram Xanax pills and three to six thirty-milligram Roxycontin pills. Taking Xanax caused him to have memory loss, but he could still drive a car. He said that taking a mixture

of Xanax and Roxycontin caused him to be unable to remember "much of anything." He said that the signatures on his statements appeared to be his signatures but that he did not remember much about the morning of October 13, including his speaking with Detective Huffine. He said that he remembered talking with Detective Ricker but that he did not remember everything they said. He said that he woke up in the "drunk tank" about three days later and that he did not understand what he was signing when he signed the consent to search form. He said he would not have signed his statements if he had understood what he was signing.

On cross-examination, the appellant acknowledged that he signed a waiver of rights form thirteen years prior to the suppression hearing and that he was an adult when he signed the form. He acknowledged that he responded to the officers' questions in this case.

The trial court noted that Sheriff Burns did not notice anything unusual about the appellant and that he allowed the appellant to drive to the sheriff's department. The court stated that the appellant's statements were "detailed with many facts" and that all of the officers said the appellant "appeared to be fine." The appellant responded to the officers' questions, appeared to understand what he was doing, and was cooperative. The trial court ruled that the appellant knowingly and voluntarily gave his statements to police.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, thus necessitating our examination of the voluntariness of a

statement taken during custodial interrogation. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). Specifically, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). We note that if, prior to making a statement, the police inform the accused of his Miranda rights and the accused proceeds to knowingly and voluntarily waive those rights, the statement is then admissible against the accused due to the valid waiver of the privilege against self-incrimination. Callahan, 979 S.W.2d at 581 (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)). In reviewing a trial court's ruling on a motion to suppress, we will uphold the trial court's findings of fact unless the evidence preponderates otherwise. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).

"In determining whether a confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances." State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000). Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996).

Turning to the instant case, the trial court obviously accredited the officers' testimony over that of the appellant. The officers testified that the appellant signed the waiver of rights forms, was cooperative, and answered their questions. The appellant appeared to understand what he was doing and did not appear to be under the influence of any drugs. Sheriff Burns even allowed the appellant to drive to the sheriff's department. As noted by the trial court, although the appellant claimed at the hearing that he was so intoxicated by drugs that he could not remember what happened on October 13, his statements about the crimes and the events leading up to the crimes were very detailed. Thus, the evidence does not preponderate against the trial court's findings, and we conclude that the trial court correctly denied the appellant's motion to suppress.

### C. Co-defendant's Statement

The appellant contends that the trial court erred by refusing to allow him to show that Myers said in her statement to police that she kicked in the door to the victims' trailer. The State contends that the appellant is not entitled to relief. We agree with the State.

At trial, Detective Ricker testified about the contents of the appellant's first, second, third, and fifth statements. At the conclusion of his testimony, the jury left the courtroom, and defense counsel stated as follows:

> Detective Ricker . . . took a statement from co-defendant Jessica Myers. In that statement . . . , Jessica Myers told Detective Ricker that she kicked the door in. That is exculpatory to the defendant obviously. It is inculpatory to Jessica Myers, it's against penal interest and I would like permission to ask him if that is the information that he received from her without opening the door for her entire statement to [be] brought into evidence. I'm not going to ask him anything else.

The trial court ruled that Myers' statement was hearsay and that the appellant was trying to "cherry-pick" Myers' statement. The trial court held that if the appellant wanted to ask Detective Ricker about a portion of Myers' statement, then "the whole statement would come in." Defense counsel acknowledged that he did not want the entire statement to be admissible, so the trial court denied his request to question Detective Ricker about a portion of Myers' statement. Defense counsel asked to make an offer of proof, and Detective Ricker testified outside of the jury's presence that Myers said in her statement, "I kicked the front door in."

Our supreme court has stated that generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." Pylant v. State, 263 S.W.3d 854, 870 (Tenn. 2008). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802.

We conclude that the trial court properly denied the appellant's request to question Detective Ricker about a portion of Myers' statement. Initially, we disagree with the

appellant's claim that Myers' statement about her kicking in the door was exculpatory to him. In any event, the trial court correctly determined that Detective Ricker's testimony would have been hearsay, and the appellant does not claim on appeal that Myers' statement falls within any exception to the hearsay rule. Therefore, we conclude that the trial court did not err by refusing to allow the appellant to question Detective Ricker about Myers' statement.

## D. Appellant's Failure to Testify

Finally, the appellant contends that the trial court erred by failing to grant his request for a mistrial when the prosecutor commented about his failure to testify. The State argues that the appellant waived the issue for failing to make a contemporaneous objection and that the error, if any, does not rise to the level of plain error. We conclude that the trial court did not err by denying the request for a mistrial.

During closing arguments, defense counsel stated as follows:

> You won't hear any evidence, you didn't hear any evidence that it was an execution-style shooting. What did you see from -- what you can see from Detective Morgan's testimony is that there was a scuffle of some kind in the living room, things were turned over, chairs pushed across the room. Disarray was the word that he used, I think. And what that indicates is that there was a fight, there was a struggle. If someone ever broke in my house, I hope I would fight back too, like Jimmy Cutshall obviously did. But what that doesn't tell us is that he was laying there and somebody shot him six times. It's more reasonable, under the evidence that you have, to assume that there was a struggle and he got shot.

During the State's rebuttal closing argument, the prosecutor said,

> The defendant is responsible for this shooting. Would this death have ever occurred if it had just been one? If one had said I'm not going, you're all by yourself? No. These two -- these three needed each other to work together, pump each other up. Is he less responsible if he was not the shooter? Is he any less responsible for the death of Jimmy Lee Cutshall? Was there

-11-

some kind of accident in this killing? Was there some kind of self-defense that I haven't heard about? Was one of the two that went in this home merely the bullet and the other one was the one that pointed it? I want to say right now, he's responsible.

After the trial court gave the jury charge and the jury left the courtroom, defense counsel asked for a mistrial "on the basis that during his closing argument, [the prosecutor] made an impermissible comment about the defendant's right not to testify when he said, and I quote, 'Was there some kind of self-defense I haven't heard about.'" The trial court noted that counsel failed to make a contemporaneous objection and ruled that the prosecutor was not making a "direct reference" to the appellant's failure to testify. The trial court held that the prosecutor did not say anything prejudicial and denied the appellant's motion for a mistrial.

On appeal, the appellant maintains that the State impermissibly commented on his failure to testify. He contends that he did not make a contemporaneous objection to the comment because objecting would have alerted the jury to the fact that he had not testified. The State claims that the prosecutor was responding to defense counsel's closing argument and that any error does not constitute plain error.

It is constitutionally impermissible for a prosecutor to comment upon the accused's silence during the course of trial. State v. Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996). However, we agree with the trial court that the prosecutor was not commenting on the appellant's failure to testify. In our view, the prosecutor was responding to defense counsel's argument that the shooter accidentally shot Mr. Cutshall during a struggle. We note that during defense counsel's closing argument, he went on to say, "The Judge will tell you that even though Shawn Jones didn't testify, he is still presumed to be innocent." Therefore, it was defense counsel, not the prosecutor, who directly commented on the appellant's failure to testify. Regardless, assuming arguendo that the prosecutor's statement could be construed as an indirect reference to the appellant's failure to testify, the trial court gave the following instruction during the jury charge:

> The defendant has not taken the stand to testify as a witness, but you shall place no significance on this fact. The defendant is presumed innocent, and the burden is on the State to prove his guilt, beyond a reasonable doubt. He is not required to take the stand in his own behalf and his election not to do so

cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

We generally presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Moreover, given the proof against the appellant, any error was harmless. See Tenn. R. App. P. 36(a).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE